**ST. LOUIS UNION TRUST COMPANY, a corporation, Kenneth H. Bitting, Jr., William C. Bitting and George C. Bitting, as Executors of the Last Will of Kenneth H. Bitting, Deceased, Plaintiffs-Appellees,**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, a corporation, Donald T. Regan, Ned B. Ball and George L. Shinn, Defendants-Appellants.**

No. 76–1447.

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1977.

Decided Aug. 26, 1977.

Rehearing and Rehearing En Banc Denied Oct. 27, 1977.

William P. Rogers (argued and made rebuttal), and Stanley Godofsky, James N. Benedict, New York City, Ernest L. Folk, III, Charlottesville, Va., James B. May and Roger J. Hawke, New York City, and John J. Cole, St. Louis, Mo., on brief and reply brief for defendants-appellants.

Veryl L. Riddle (argued), and Thomas C. Walsh, Daniel R. O'Neill and John J. Hennelly, Jr., St. Louis, Mo., on brief for plaintiffs-appellees.

Before HEANEY, ROSS and STEPHENSON, Circuit Judges.

ROSS, Circuit Judge.

This appeal raises substantial questions concerning the validity of an option held by Merrill Lynch, Pierce, Fenner & Smith, Inc. (hereinafter Merrill Lynch) to repurchase its own stock from a deceased shareholder's executors. The district court found violations of the securities fraud provisions of § 10(b) of the Securities Exchange Act of 1934 [1] and Rule 10b–5 [2] thereunder, as well as common law fraud and breach of fiduciary duty under state law.[3] *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 412 F.Supp. 45 (E.D.Mo. 1976). The district court awarded the plaintiffs $1,452,090 plus prejudgment interest in actual damages and $2,000,000 in punitive damages. *Id.* at 61–62. We hold that the plaintiffs were not entitled to relief on their federal and state claims as a matter of law. Accordingly, we reverse and order the complaint dismissed.

The plaintiffs are the executors of the Estate of Kenneth H. Bitting, a former officer, employee and stockholder of Merrill Lynch. The defendants are Merrill Lynch and three of its senior executives, Donald T. Regan, Ned B. Ball and George L. Shinn.

In 1947, Kenneth Bitting operated a stock brokerage partnership known as Bitting, Jones & Company in St. Louis, Missouri. In that year, the Bitting partnership merged into Merrill Lynch, which was then a national stock brokerage partnership, and became the St. Louis office of Merrill Lynch. Between 1947 and 1951, Bitting was an employee of the Merrill Lynch partnership. In 1951, he became a general partner of the firm.

In 1959, the Merrill Lynch partnership was dissolved and the business was incorporated. In return for their interests in the partnership, each partner, including Kenneth Bitting, received shares of common stock in Merrill Lynch. Bitting received 9,100 shares of voting stock and a $58,000 debenture in exchange for his partnership capital. In October 1959, Merrill Lynch split its stock on a three for one basis and Bitting became the owner of 27,300 shares of voting stock. Bitting had acquired all of his stock at a cost based on book value.

Under Merrill Lynch's original Certificate of Incorporation, all common stock, including that issued to Kenneth Bitting, was restricted against transfer. Under the terms of the Charter, Merrill Lynch was granted an option to purchase the holder's stock at an adjusted net book value price upon the occurrence of several specified contingencies, including the death of the holder. This transfer restriction was conspicuously noted on each stock certificate. Likewise the stockholder or his executors were given a right to "put" the stock to Merrill Lynch and it was then required to purchase that stock at book value.

---

1. 15 U.S.C. § 78j.

2. 17 C.F.R. § 240.10b–5.

3. The federal and state claims are properly before us. Federal question jurisdiction exists with respect to the securities fraud claim and diversity jurisdiction exists with respect to the state claims.

In 1962, Bitting retired from the company. At that time, in accordance with company policy, he exchanged his 27,300 shares of voting stock for over $400,000 in cash and 10,000 shares of nonvoting stock. Between 1962 and 1970, Bitting became the owner of 40,000 shares of nonvoting stock as a result of two additional stock splits.

On October 8, 1970, Kenneth Bitting died. Pursuant to its Charter, Merrill Lynch exercised its option to purchase. the 40,000 shares at a price of $26.597 per share, the net book value as of October 30, 1970. The option was exercised by the company on November 18, 1970.[4] The total price was $1,063,880. Thereafter the corporation offered Bitting's widow an opportunity to purchase 10,000 shares of nonvoting stock at the same price, which she accepted. Some other widows had been given similar options.

Between 1959 and 1971, Merrill Lynch was a privately held company. On April 12, 1971, the company publicly announced that it was "going public"—that it was going to make its shares available to the public. On June 23, 1971, following registration with the SEC and a three for one stock split, four million shares of the company's stock were offered to the public at a price of $28 per share. The offering price per share was approximately three times the price which was paid to the Bitting executors in accordance with the terms of the stock restriction contained in Merrill Lynch's Certificate of Incorporation.

The plaintiffs' complaint is grounded on allegations that the decision to go public in the spring of 1971 was made by a tightly knit group of insiders within the company's management hierarchy before the company purchased the Bitting stock.[5] The plaintiffs say that their stock was purchased in furtherance of a fraudulent scheme on the part of the inside group to enhance the price at which the company's stock was to be offered to the public and to maintain and preserve their control of company management after public ownership.

After a nonjury trial, the court substantially adopted the plaintiffs' theory of the case. The court held that the option was unenforceable under Delaware law and was fraudulently exercised by the defendants to the detriment of the plaintiffs in order to increase the per share earnings of Merrill Lynch stock prior to the public offering and to maintain management control.

## I. The Enforceability of the Stock Restriction.

We first address the issue of whether the stock restriction was enforceable under Delaware law [6] when the stock option was exercised in November 1970.[7] The district

4. The plaintiffs have proceeded throughout this litigation under the erroneous impression that the individual defendants—Regan, Ball and Shinn—were somehow responsible for the enforcement of the stock restriction against the Bitting executors. However, the defendants did not enforce the Bitting stock restriction—indeed they had no power to do so in November 1970. That power resided only with James E. Thompsen, then Chairman of the Board, who, the record shows, undertook the enforcement of the stock restriction not only as to Bitting but as to other deceased stockholders.

5. The plaintiffs' position is that the "decision" to go public in the spring of 1971 was made by the individual defendants on July 14, 1970, at which time the board of directors approved the formation of a legal and accounting task force to conduct a legal and accounting audit preparatory to public ownership decisions. The plaintiffs say that the Task Force, at the direction of the individual defendants, secretly undertook all necessary steps for public ownership in the spring of 1971 without authority from the board of directors. Between July 1970 and April 1971, the Task Force engaged the accounting firm of Haskins & Sells to prepare financial statements and a ten-year audit for inclusion in the registration statement. The Task Force also engaged attorneys to draft a prospectus.

6. All parties agree that the Delaware law controls the determination of the enforceability of the stock restriction.

7. We consider the transaction date to be the date on which Merrill Lynch exercised its option to repurchase as distinguished from the date of death or the date of actual payment. On November 18, 1970, Merrill Lynch was absolutely legally obligated to purchase this stock, and the case must be decided on the basis of the facts up to and including that date. Although not necessary to the decision in this

court held that the option was not enforceable at that time. We disagree and hold that the restriction was enforceable under § 202(c)(1) of the Delaware General Corporation Law.

Article VI, Section 1(a) of the Merrill Lynch Certificate of Incorporation, the provision under which Kenneth Bitting's stock was called, provides in pertinent part as follows:

 * * * [I]n the event of the death * * of any holder of common stock of the Corporation * * *, the Corporation shall have the right and option which shall be prior to any other right and option, to purchase the shares of common stock of the Corporation held by the deceased * * * for a period of ninety (90) days from the earlier of: (i) the date the Corporation receives from the legal representative of such holder written notice * * * of the death * * * of such holder, or (ii) the date the Corporation mails written notice * * * that the Corporation is on notice of such death * * *.

This restriction was noted conspicuously on each Merrill Lynch stock certificate and was indisputably assented to by Bitting when the stock was issued to him. There has been no contention, nor could there be on this record, that Bitting's assent was induced by fraud, deceit or any other improper motive.

The enforceability of the restriction rests on our construction of Section 202 of the Delaware General Corporation Law, which was in existence in November 1970 when the restriction was enforced. Section 202(a) carries the label "Restriction on transfer of securities" and reads as follows:

 A written restriction on the transfer or registration of transfer of a security of a corporation, if permitted by this section and noted conspicuously on the security, may be enforced against the holder of the restricted security or any successor or transferee of the holder including an executor, administrator, trustee, guardian or other fiduciary entrusted with like responsibility for the person or estate of the holder.

Section 202(c) declares four types of restrictions valid without inquiry into the existence *vel non* of a lawful or reasonable purpose. Section 202(c)(1), the pertinent provision for our purposes, provides as follows:

 (c) A restriction on the transfer of securities of a corporation is permitted by this section if it:

 (1) Obligates the holder of the restricted securities to offer to the corporation or to any other holders of securities of the corporation or to any other person or to any combination of the foregoing, a prior opportunity, to be exercised within a reasonable time, to acquire the restricted securities; * * *.

▪ This statute on its face validates the stock restriction at issue. The statute declares the enforceability of any restriction which "[o]bligates the holder of the restricted securities to offer to the corporation * * * a prior opportunity * * * to acquire the restricted securities * * *." That is precisely what Merrill Lynch's Charter required of Kenneth Bitting's estate in this case.

We have not found, and the parties have not cited to us, any reported Delaware decision construing § 202(c)(1). However, in *DeVries v. Westgren*, 119 Pittsburgh L.J. 61 and 109 (C.P. Allegheny County 1970), *aff'd as modified*, 446 Pa. 205, 287 A.2d 437 (1971), the court enforced a stock restriction requiring a shareholder to offer all of his common stock to the corporation upon the voluntary or involuntary termination of his employment under a Pennsylvania statute *identical* to § 202(c)(1).[8] The defendant shareholder was involuntarily terminated

case, we have examined the record carefully and have reached the conclusion that there was no fraud on the part of the defendants prior to November 18, 1970, at least as such alleged fraud may have applied to Bitting. To the extent that the district court held to the con-

trary, we consider his factual findings to be clearly erroneous.

8. *See* 15 Pa.Stat.Ann. § 1613.1(C)(1) (Cum. Supp.1977) (Purdon).

by the company and was sued by the other shareholders when he refused to surrender his shares pursuant to the stock restriction. The court enforced the stock restriction, holding that the option was a legal and enforceable agreement "clearly" within the permissive language of the statute. In affirming, the Pennsylvania Supreme Court held:

> [U]nlike a right of first refusal whereby the appellant could elect to retain his shares and never sell to anyone, the stock purchase agreement requires the appellant to offer his shares to the remaining shareholders upon the termination of his employment. In our view, the requirement that appellant offer his shares, whether or not he wished to retain them, lends a quality of irrevocability to the stock purchase agreement and justifies our treatment of this agreement as an option contract.

*Id.*, 287 A.2d at 438.

■ The plaintiffs advance the argument, embraced by the district court, that § 202(c)(1) was intended to permit only the exercise of a right of first refusal and not the exercise of an automatic option to purchase triggered by the contingency of death or other circumstance. In accepting this argument, the district court couched the distinction in terms of voluntary transfers, permitted by § 202(c)(1), and transfers by operation of law, not permitted by § 202(c)(1). 412 F.Supp. at 57.

The construction urged by the plaintiffs would amount to nothing less than a judicial rewriting of the statute, and we reject it. Section 202(a), which modifies each subsection of the statute *including § 202(c)(1)*, provides that a transfer restriction permitted by the section is enforceable against " * * * any successor or transferee of the holder including *an executor*, administrator, trustee, guardian or other fiduciary entrusted with like responsibility for the

person or *estate of the holder."* (Emphasis added.) We perceive this to be at least implicit recognition that repurchase options which become operable on the happening of a specified contingency—including an "involuntary" contingency such as death or incompetency—are permitted under § 202(c)(1). Furthermore, Professor Folk, the Reporter for the Delaware revision commission which prepared the law for adoption, has stated that § 202(c)(1) was intended to validate options to purchase as well as mere rights of first refusal:

> A restriction is valid if it requires the holder of restricted securities *to tender* them to designated persons who must act within a reasonable period of time thereafter. Such a restriction could take the form of a mere first refusal *or of an option to acquire the securities.*

Folk, *The Delaware General Corporation Law*, 198 (1972) (emphasis added); *cf. Ketchum v. Green*, 415 F.Supp. 1367, 1372 (W.D. Pa.1976); *DeVries v. Westgren, supra*, 446 Pa. 205, 287 A.2d at 438. Had the Delaware legislature intended to exclude commonly used and accepted repurchase options such as the transfer restriction before us,[9] it could easily have done so.

■ The plaintiffs' construction would also violate the purpose of § 202(c)(1). That purpose was to broaden, not limit, the circumstances in which such restrictions would be enforced in order to clear up the preexisting uncertain contours of the common law. *See* Arsht & Stapleton, *Analysis of the 1967 Delaware Corporation Law*, 2 P–H Corp.—Delaware 311, 333 (1967); Folk, *The Delaware General Corporation Law*, 197–199 (1972). Before § 202(c) was adopted in 1967, the Delaware courts required that a stock restriction be supported by specific justification, e. g., a reasonable or lawful purpose, to be enforceable. *See, e. g., Greene v. E. H. Rollins & Sons, Inc.,*

---

9. We observe that repurchase options such as the stock restriction in this case have been recognized as serving a number of legitimate business purposes, including restrictive ownership of corporate stock, and have been generally upheld by the courts. *See, e. g., Palmer v. Chamberlin,* 191 F.2d 532, 537–538 (5th Cir. 1951); *cf. DeVries v. Westgren,* 446 Pa. 205, 287 A.2d 437, 438 (1971). *See generally,* 6 Cavitch, *Business Organizations,* § 113.02[2] at 19–20 (1977).

22 Del.Ch. 394, 2 A.2d 249 (1938). What specific justification was sufficient to sustain a restriction under the common law was the subject of much uncertainty. *See* Folk, *The Delaware General Corporation Law*, 198 (1972). It was the purpose of § 202(c) to eliminate this uncertainty by substantively validating a wide variety of commonly accepted stock restrictions such as the provision before us. *Id.* at 198–199.[10]

In holding that § 202(c)(1) does not permit "transfers by operation of law," the district court relied on two cases. *Globe Slicing Co. v. Hasner*, 333 F.2d 413, 415 (2d Cir. 1964), *cert. denied*, 379 U.S. 969, 85 S.Ct. 666, 13 L.Ed.2d 562 (1965); *Matter of Estate of Riggs*, 36 Colo.App. 302, 540 P.2d 361, 363 (1975). These cases are wholly inapposite. In both cases the courts held that death would not be presumed to trigger the operation of a repurchase option which did not mention death as a specified contingency. In this case the death contingency was expressly provided in the company's corporate charter and was conspicuously noted on the stock certificates themselves. Neither *Globe Slicing* nor *Riggs* involved the construction of a statute such as § 202(c)(1). Accordingly, we hold that the stock restriction was enforceable under Delaware law.

## II. The Federal Securities Claim.

Having determined that the stock restriction was enforceable under the appropriate state law, we now turn to the merits of the § 10(b) and Rule 10b–5 claim. Section 10(b) of the Securities Exchange Act of 1934 provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(a) * * *

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

The SEC has prescribed Rule 10b–5 to enforce the provisions of § 10(b). Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

In connection with the purchase or sale of any security.

10. The plaintiffs place considerable reliance on *Greene v. E. H. Rollins & Sons, Inc.*, 22 Del.Ch. 394, 2 A.2d 249 (1938) and *B & H Warehouse, Inc. v. Atlas Van Lines, Inc.*, 490 F.2d 818, 826–827 (5th Cir. 1974), in arguing that the transfer restriction was unenforceable as an unreasonable restraint on the alienation of their stock. With respect to the *Greene* case, the short of the matter is that the plaintiffs' construction ignores the language and purpose of § 202(c)(1). The *B & H Warehouse* case is inapposite. There the Fifth Circuit, in applying Delaware law, held only that a transfer restriction which had not been included in either the corporation's articles of incorporation or by-

laws and had not been assented to by the plaintiff stockholder could not be enforced against the stockholder. The court stated that "* * * if the restriction being contested had been included in the original articles of incorporation, or had been a part of the by-laws when B & H acquired its stock, there would be no question that the restriction would be valid." *Id.* at 825, citing *Lawson v. Household Finance Corp.*, 17 Del.Ch. 343, 152 A. 723 (1930). The restriction in this case was included in the original articles, was conspicuously noted on the face of the stock certificates, and was assented to by Kenneth Bitting.

■ Section 10(b) and Rule 10b–5 were not intended to bring within their ambit simple corporate mismanagement or every imaginable breach of fiduciary duty in connection with a securities transaction. The gravamen of a § 10(b) and Rule 10b–5 cause of action is fraud, *viz.* manipulation or deception. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 214, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 471, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

■ Causation in fact is an essential element of a private cause of action for securities fraud under § 10(b) and Rule 10b–5. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith,* 495 F.2d 228, 238 (2d Cir. 1974); *Harris v. American Investment Co.,* 523 F.2d 220, 229 n. 7 (8th Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976); *Fridrich v. Bradford,* 542 F.2d 307, 318 (6th Cir. 1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 769 (1977). *See generally,* A. Bromberg, *Securities Law, Fraud-SEC Rule 10b–5,* § 8.7(1) at 213–214 (1967). In order to prevail in an action for securities fraud under § 10(b) and Rule 10b–5, a plaintiff must show some causal nexus between the defendant's wrongful conduct and his (the plaintiff's) loss.[11] This requirement preserves the basic concept that causation must be proved else defendants could be held liable to all the world. *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* supra, 495 F.2d at 239, *quoting from, Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1292 (2d Cir. 1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). As stated in *List v. Fashion Park, Inc.,* 340 F.2d 457, 463 (2d Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965):

\* \* \* [T]he aim of [Rule 10b–5] in cases such as this is to qualify, as between insiders and outsiders, the doctrine of *caveat emptor*—not to establish a scheme of investors' insurance.

■ The roots of the causation in fact requirement have been the subject of much disharmony. Causation has been most often analyzed in terms of the Rule 10b–5 elements of materiality or reliance. *See, e. g., Affiliated Ute Citizens v. United States, supra,* 406 U.S. at 153–154, 92 S.Ct. 1456 (materiality); *List v. Fashion Park, Inc., supra,* 340 F.2d at 462 (reliance). The materiality element requires the plaintiff to show that the misrepresentation or omission would likely have influenced in reasonable or objective contemplation the seller's decision to sell. *Cf. TSC Industries v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). The element of reliance traditionally required proof that the misrepresentation or omission actually induced the plaintiff to act differently than he would have acted in his investment decision. See *Myzel v. Fields,* 386 F.2d 718, 735 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). However, in *Affiliated Ute Citizens v. United States, supra,* 406 U.S. at 153–154, 92 S.Ct. 1456, the Supreme Court held that when a Rule 10b–5 violation involves a failure to disclose, positive proof of reliance is not a prerequisite to recovery. The Court said:

All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

---

11. Some courts and commentators have distinguished between transaction causation and loss causation, the former requiring a connection between the defendant's wrongful conduct and the plaintiff's investment decision (i. e. transaction) and the latter requiring a connection between the defendant's wrongful conduct and the plaintiff's loss. *E. g., Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380–381 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976,

44 L.Ed.2d 467 (1975); A. Bromberg, *Securities Law, Fraud-SEC Rule 10b–5,* § 8.7(1) at 215–216 (1967); Note, *The Nature and Scope of the Reliance Requirement in Private Actions under SEC Rule 10b–5,* 24 Case Western Reserve L.Rev. 363, 380–381 (1973). *But see Schlick v. Penn-Dixie Cement Corp., supra,* 507 F.2d at 384 (Frankel, J. concurring). We perceive little relevance in pursuing this distinction in this case.

*Id.* at 153–154, 92 S.Ct. at 1472 (citations omitted); *see also Chasins v. Smith, Barney & Co.,* 438 F.2d 1167, 1172 (2d Cir. 1970). However, the consensus of authority, to which we ascribe, has declined to read into *Affiliated Ute Citizens* a conclusive presumption of reliance in all nondisclosure cases in which materiality has been established. *See Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 410 (3d Cir. 1974); *Carras v. Burns,* 516 F.2d 251, 257 (4th Cir. 1975); *Chelsea Associates v. Rapanos,* 527 F.2d 1266, 1271–1272 (6th Cir. 1975). As the Third Circuit said in *Rochez Bros., Inc. v. Rhoades, supra,* 491 F.2d at 410:

> We do not read this decision to say that the question of reliance *vel non* may not be considered at all in a non-disclosure case, but only that proof of reliance is not required for recovery. If defendant is able to demonstrate that there was clearly no reliance, that is, that even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was, then the non-disclosure cannot be said to have caused the subsequent loss and under the ordinary principles of the law of fraud, recovery should be denied. However, in light of the Supreme Court's holding in *Affiliated Ute,* the burden of proof rests squarely upon the defendant to establish the "non-reliance" of plaintiff. (Citation omitted.)

*See also Carras v. Burns, supra,* 516 F.2d at 257; *Chelsea Associates v. Rapanos, supra,* 527 F.2d at 1271–1272. *See generally,* Note, *The Reliance Requirement in Private Actions under SEC Rule 10b–5,* 88 Harv.L. Rev. 584, 606 (1975); Note, *The Nature and Scope of the Reliance Requirement under SEC Rule 10b–5,* 24 Case Western Reserve L.Rev. 363, 388 (1973). *But see Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380–381 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

 Whether we analyze the causation issue before us in terms of materiality, reliance or both, the result is the same: causation in fact does not exist as a matter of law under § 10(b) and Rule 10b–5. Any "loss" which was occasioned by the sale of the Bitting stock to the corporation was not caused by any material omission, fraudulent or otherwise, on the part of the defendants. The purported "loss" was caused by two events unrelated to the alleged fraud: 1) the execution of the stock restriction, which was enforceable under Delaware law,[12] and 2) the death of the shareholder Bitting, the specified contingency which triggered the operation of the stock restriction. Whatever the Bitting executors knew or did not know about a future public offering of Merrill Lynch stock [13] was wholly irrelevant to their decision to sell the stock. After Kenneth Bitting died on October 8, 1970, the decision to sell was out of their hands; they were contractually bound to sell under Article VI, Section 1(a) of the Merrill Lynch Certificate of Incorporation if Merrill Lynch exercised its option.[14] Any informa-

---

**12.** We emphasize that the stock agreement was executed in good faith between the contracting parties. The plaintiffs do not claim that the stock restriction became part of the bargain as a result of any fraud in the inception.

**13.** What the plaintiffs knew about the prospects of a public offering was hotly disputed at trial. We note in passing that after the death of Kenneth Bitting, plaintiff George Bitting expressed to the company his father's intent that the 40,000 shares be kept in the family because of the prospect that some day Merrill Lynch would go public. Mr. Williamson, the company representative who talked with George Bitting, told him that his thoughts about a public offering "might" be true but that the company could call the stock irrespective of any future public offering. We also observe that Merrill Lynch's intention to go public at some future time was widely reported in several publications before the Bitting stock was called.

**14.** The district court found that Merrill Lynch " * * * had no uniform policy of exercising the options to purchase stock at retirement or death of a stockholder." With respect to the enforcement of options to purchase on retirement, the district court's analysis is irrelevant, although we note that the record appears to support the defendants' claim that the retirement options were uniformly exercised. With respect to the enforcement of options to purchase on death, the district court's finding is clearly erroneous. In each instance between 1959 and April 9, 1971, three days before the company announced it was going public, Merrill Lynch *automatically* exercised its option in

tion concerning the public offering was not "material" in the sense that a reasonable or objective investor, in the plaintiffs' circumstances, would likely have considered it important in making his decision to sell. Likewise, in reliance terms, any information concerning the public offering could not have subjectively influenced the plaintiffs to act differently than they did act in selling the shares to the corporation pursuant to the terms of the stock restriction. The defendants were thus under no obligation—and had no federal "duty" under § 10(b) and Rule 10b–5—to disclose any information to the plaintiffs concerning the public offering when the stock restriction was enforced.[15]

The decided cases support our conclusion. In *Ryan v. J. Walter Thompson Co.*, 453 F.2d 444, 447 (2d Cir. 1971), *cert. denied*, 406 U.S. 907, 92 S.Ct. 1611, 31 L.Ed.2d 817 (1972), the defendant company enforced a stock restriction enabling it to repurchase its stock from holders who either desired to sell or ceased to be officers or employees of the company. Ryan, a vice-president and director of the company, retired on January 31, 1966. On January 14, 1969, several months after the company had undertaken

preparations to offer some of its stock to the public, but several months before the public offering took place, the company enforced the stock restriction. Ryan sued, claiming that the company's failure to disclose its contemplated public offering in connection with the sale constituted a violation of § 10(b) and Rule 10b–5. In affirming the district court's dismissal of the securities fraud claim, the Second Circuit said:

> With respect to the Rule 10b–5 claim, the District Court held that, since Ryan was obligated to sell his shares to JWT in January 1969, whatever he knew or did not know regarding JWT's plans to go public was irrelevant. We agree. See *Fershtman v. Schectman*, 450 F.2d 1357, 1360 (2d Cir. 1971). Ryan's reliance upon *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), is misplaced. Even under the broadest interpretation of the language of *Texas Gulf Sulphur*, Rule 10b–5 does not spread a comfortable canopy to keep Ryan out of the inclement weather.

*Id.* at 447.

In *Fershtman v. Schechtman*, 450 F.2d 1357 (2d Cir. 1971), *cert. denied*, 405 U.S.

full to purchase the shares of voting and non-voting stockholders who died. The disparate treatment of which the district court spoke resulted from a longstanding company policy permitting certain widows to repurchase a percentage (usually 25%) of their deceased husband's holdings in nonvoting stock as a reward for the husband's faithful service to the company. Mrs. Bitting was treated substantially the same as those widows who were accorded this privilege. She was permitted to repurchase 25% of her husband's holdings in nonvoting stock.

The district court relied heavily on what it perceived to be favoritism in the administration of the Charles E. Merrill Trust. The facts belie any finding of favoritism. The Merrill Trust had nothing to do with the enforcement of a stock option at the death of a shareholder. The Trust itself was a shareholder—indeed had been since Merrill Lynch was incorporated—of the corporation. It is true that the Trust and the corporation entered into a contract permitting 10% of the stock of the Trust to be sold each year over a period of ten years, the last year being 1976. The purpose for the contract was completely innocent however. Merrill Lynch was fearful that it would be unable to

redeem all of the stock held by the Trust at any one time as it could have been forced to do under the Certificate of Incorporation. The corporation therefore opted for gradual assimilation of the stock into the company. It is also true that the 1969 sale of shares was deferred *pursuant to the terms of the contract* until 1971. However, this decision was not motivated by any inside information relating to the public offering. Indeed, the decision to defer the 1969 sale took place on June 19, 1969, more than a year *before* the alleged secret management decision to go public.

**15.** The plaintiffs have not suggested how they might have acted differently had they been given prior notice of any company preparations to go public, aside from the observation that they would have taken every possible legal action to protect their interests. However, plaintiffs could have litigated nothing more at that time than they have litigated in this case. The point we wish to emphasize is that plaintiffs could have done nothing to block the sale of the stock. *Cf. Santa Fe Industries, Inc., v. Green*, 430 U.S. 462, 474, n. 14, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972), cited with approval in the *Ryan* case, the limited partners of a partnership sued the general partners under § 10(b) and Rule 10b–5 claiming, *inter alia*, misrepresentations and nondisclosures in connection with a forced sale of the plaintiffs' interests pursuant to the termination of the partnership. In affirming the district court's dismissal of the complaint, Judge Friendly said:

> * * * [I]f the defendants were legally entitled to terminate the partnership on March 31, 1968, in their sole discretion, it would make no difference what they misrepresented or concealed, even if we assume in plaintiff's favor that this transaction constituted a sale.

*Id.* at 1360.

*Ketchum v. Green,* 415 F.Supp. 1367 (W.D.Pa.1976) involved the enforcement of a duly executed stock restriction against the plaintiffs, who were squeezed out of their managerial positions by a majority of the board of directors. After the plaintiffs' employment was terminated, they were required to sell to the company all of their stock pursuant to the stock restriction which required such a sale "on [the employee's] termination of employment for any reason or on his death." The plaintiffs sued under § 10(b) and Rule 10b–5, alleging damages resulting from the fraudulent forced sale of their stock at less than market value. Judge Teitelbaum dismissed the claim, reasoning as follows:

> Obviously, neither objective materiality nor subjective reliance is present here. Plaintiffs were contractually bound to sell their shares to [the company] upon termination of their employment. They had no choice in this matter at the time of the operative events in this case. Clearly, the alleged fraud could not have influenced a reasonable man's decision to sell his stock to [the company] after termination when that man had previously committed himself to such a sale; nor could plaintiffs themselves have relied on allegedly fraudulent acts occurring long

after plaintiffs had contracted to make the sale in question.

*Id.* at 1371–1372.[16] *See also Lawrence v. Sudman,* 70 F.Supp. 387, 394–396 (S.D.N.Y. 1945); *Bank v. Fleisher,* 419 F.Supp. 1243, 1248–1251 (D.Neb.1976).

In *Blackett v. Clinton E. Frank, Inc.,* 379 F.Supp. 941 (N.D.Ill.1974), a former employee of the defendant corporation brought a § 10(b) and Rule 10b–5 action against the company and its chief executive officer in connection with the enforcement of a duly executed stock purchase agreement which, like the stock restriction in this case, was enforceable under Delaware law. The stock purchase agreement required the corporation to purchase, and the stockholder or his personal representatives to sell, the stockholder's shares in the event of death or termination of his employment. The plaintiff's employment was terminated and the company enforced the restriction. The plaintiff alleged that the defendants had fraudulently failed to disclose, *inter alia*, the prospect of a public offering of the company's stock in enforcing the restriction. Judge Bauer dismissed the complaint because the sale of the plaintiff's stock was in no way induced or caused by any misrepresentations on the part of the defendants. He said:

> Since the plaintiff was obligated by the 1969 Stock Purchase Agreement to sell his shares of [the company] at the time of his termination, whatever he knew or did not know regarding [the company's] plans to go public * * * was irrelevant. Clearly the plaintiff has not properly alleged, nor do the relevant pleadings support a conclusion, that the plaintiff was fraudulently induced into selling his shares of [the company] by the material misrepresentation made by the defendants. In fact, the plaintiff apparently had no choice in the matter; he was obligated to sell his stock pursuant to the provision of the 1969 Stock Purchase

---

**16.** The Third Circuit has recently affirmed the district court's disposition in *Ketchum v.*

*Green,* 557 F.2d 1022 at 1028–1029. (3d Cir., filed June 30, 1977).

Agreement as soon as [the company] had terminated his services.

*Id.* at 947.

Stripped of all its rhetoric, the plaintiffs' claim under § 10(b) and Rule 10b–5 boils down to the following: 1) the stock restriction served no valid corporate purpose in November 1970 and was thus unenforceable; 2) the defendants owed to the plaintiffs a supervening (between the execution and enforcement of the stock restriction) fiduciary duty of fair dealing; and 3) the defendants breached this duty by fraudulently enforcing the stock restriction without disclosing their preparations to take the company public. The plaintiffs cite numerous cases to support their theory. *See, e. g., Schoenbaum v. Firstbrook,* 405 F.2d 215, 218–220 (2d Cir. 1968) (en banc), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Drachman v. Harvey,* 453 F.2d 722, 736 (2d Cir. 1972) (en banc); *Travis v. Anthes Imperial Limited,* 473 F.2d 515, 521–522 (8th Cir. 1973); *Coffee v. Permian Corp.,* 474 F.2d 1040, 1043–1044 (5th Cir.), *cert. denied,* 412 U.S. 920, 93 S.Ct. 2736, 37 L.Ed.2d 146 (1973); *Bryan v. Brock & Blevins Co., Inc.,* 490 F.2d 563, 569–571 (5th Cir.), *cert. denied,* 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974); *Green v. Santa Fe Industries, Inc.,* 533 F.2d 1283, 1289–1291 (2d Cir. 1976), *rev'd,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Bailey v. Meister Brau, Inc.,* 535 F.2d 982, 993 (7th Cir. 1976); *Speed v. Transamerica Corp.,* 99 F.Supp. 808, 828–829 (D.Del.1951), *aff'd,* 235 F.2d 369 (3d Cir. 1956); *Voege v. American Sumatra Corp.,* 241 F.Supp. 369, 375 (D.Del. 1965).

With respect to the first contention, we have previously noted that the stock restriction was enforceable under § 202(c)(1) of the Delaware General Corporation Law without regard for the existence of a "valid" or "lawful" corporate purpose. To the extent the plaintiffs take the position that such a requirement should be superimposed on § 10(b) and Rule 10b–5, we reject it. In *Santa Fe Industries, Inc. v. Green, supra,* 430 U.S. at 478, 97 S.Ct.

1292, the Supreme Court stated that § 10(b) and Rule 10b–5 should not be extended to cover a cause of action which has been traditionally relegated to state law. The Court emphasized that requirements of state corporation law, such as the existence of a "valid corporate purpose" for the elimination of the minority interest in a short form merger, should not be transposed on a § 10(b) and Rule 10b–5 action because of the danger of vexatious litigation and the potential for interference with state corporate law. *Id.* at 479 & n. 16, 97 S.Ct. 1292. The Court also said:

Absent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden. As the Court stated in *Cort v. Ash,* [422 U.S. 66, 84, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)], "Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law *expressly* requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation.

*Id.* at 479, 97 S.Ct. at 1303 (emphasis in original). To require a "justifiable corporate purpose" in this case would impose a more stringent federal fiduciary standard on the defendants than the State of Delaware has itself imposed. As we noted previously, § 202(c)(1) of the Delaware General Corporation Law declares that transfer restrictions such as the one involved in this case are enforceable without inquiry into the existence of a "valid" or "lawful" corporate purpose. The purpose of § 202(c)(1) was to clear up the murky state of Delaware common law concerning transfer restrictions by validating such restrictions without necessitating specific justification. *See* Folk, *The Delaware General Corporation Law,* at 198 (1972). We decline to override the Delaware statute, as well as

the corporate law of other states,[16a] by extending § 10(b) and Rule 10b–5 beyond its intended limits. *Cf. Santa Fe Industries, Inc. v. Green, supra,* 430 U.S. at 477, 97 S.Ct. 1292.[17]

With respect to the second and third contentions, whatever fiduciary duty of fair dealing the defendants might have owed to the plaintiffs in November 1970 was not breached by the enforcement of the stock restriction. The sale was triggered by Kenneth Bitting's death and the corporation's legal entitlement to call the plaintiffs' shares on the happening of that contingency, not by any supervening bad faith on the part of the defendants. In each of the cases cited by the plaintiffs, an improper motive of the control group or a responsible person *caused* the corporation or the affected shareholder to suffer a loss in a transaction it would not otherwise have undertaken. This causation element is not present in this case.

The plaintiffs also rely on *Ayres v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 538 F.2d 532 (3d Cir.), *cert. denied,* 429 U.S. 1010, 97 S.Ct. 542, 50 L.Ed.2d 619 (1976), in which the plaintiff Ayres, a former employee-shareholder of Merrill Lynch who had voluntarily retired from the company, claimed that the company had violated § 10(b) and Rule 10b–5 by exercising an option to purchase his stock without informing him of its plans to go public. The Third Circuit rejected Merrill Lynch's claim that the nondisclosure was not material as a matter of law. The court distinguished *Ryan v. J. Walter Thompson, supra,* on the ground, *inter alia,* that Ayres' decision to retire amounted to a voluntary decision to sell and that he could and would have elected not to retire and not to sell his stock had he known of the company's plans to go public. *Ayres v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra,* 538 F.2d at 537.

Even if we assume the correctness of the *Ayres* decision,[18] it is clearly distinguishable from the case before us. The Third Cir-

---

**16a.** *See, e. g., DeVries v. Westgren,* 446 Pa. 205, 287 A.2d 437, 438 (Pa.1972), *aff'g as modified,* 119 Pittsburg L.J. 61 and 109 (C.P. Allegheny County 1970).

**17.** In *Polin v. Conductron Corp.,* 552 F.2d 797, 815 (8th Cir. 1977), this circuit held that a legitimate business purpose for mergers which have the effect of eliminating private shareholders is of critical importance in appraising the bona fides of the transaction under Rule 10b–5. This holding would appear undermined by the subsequent pronouncement of the Supreme Court in *Green.*

 Assuming, arguendo, that a lawful or valid business purpose was required, we note that the transfer restriction was justified by a number of lawful and reasonable business purposes. Rule 313.21 of the New York Stock Exchange, of which Merrill Lynch was a member, *required* the company to repurchase the shares of any stockholder who died, so long as the stock was not freely transferable. It is true that on March 26, 1970, the Exchange amended its rules to permit member firms to hold freely transferable securities. However, Rule 313.21 continued to apply to Merrill Lynch until the company had freely transferable stock outstanding. This occurred on June 23, 1971, the date of the public offering, *after* the Bitting stock was purchased. Additionally, in 1959, the company obtained an exemption from the registration requirements of the Securities Act of 1933 on the representation to the SEC, *inter alia,* that the Exchange required the company to have an option to purchase the shares on the happening of certain contingencies. In 1967, Merrill Lynch obtained an exemption from the registration and reporting requirements of § 12(g) of the Securities Exchange Act of 1934 on the basis of its representation that it would remain a privately held company by enforcing its stock restrictions. At the time the Bitting stock was purchased, the company could have reasonably believed that the removal of the stock restrictions would have created a public market for the company's stock and, in view of the unavailability of the registration materials, resulted in a violation of the securities laws. Finally, the corporation had a legitimate interest in limiting stock ownership to those persons active in the business.

**18.** We have serious doubts about the correctness of the majority's disposition in *Ayres.* As Judge Stern pointed out in dissent, Merrill Lynch had an unfettered right to purchase Ayres' stock at any time on 90 days' notice irrespective of its option to purchase when Ayres retired. To the extent that the stockholder had any choice to make, it was not a decision to sell his securities but was rather a decision to retire or not. *Ayres v. Merrill Lynch, Pierce, Fenner & Smith,* 538 F.2d 532, 540 (3d Cir.) (Stern, J. dissenting), *cert. denied,* 429 U.S. 1010, 97 S.Ct. 542, 50 L.Ed.2d 619 (1976), citing *Ryan v. J. Walter Thompson,* 453 F.2d 444 (2d Cir. 1971), *cert. denied,* 406 U.S. 907, 92 S.Ct. 1611, 31 L.Ed.2d 817 (1972).

cuit's rejection of the defendant's causation argument was premised on the critical fact that the stockholder could and would have altered his position had he been apprised of the company's plans to go public. This element is conspicuously absent here. The stock option in this case was triggered by Kenneth Bitting's death, an event wholly uncontrollable by the plaintiffs. The plaintiffs here were powerless to prevent the contingency which gave the company its absolute right to purchase.[19]

## III. The State Law Claims.

### A. Common Law Fraud.

 We also reject the district court's holding that defendants were liable under the theory of common law fraud. 412 F.Supp. at 60–61. Under Missouri Law,[20] the elements of common law fraud are as follows:

\* \* \* [A] representation;[21] its falsity; its materiality; the speaker's knowledge of the falsity or his ignorance of its truth; the speaker's intent that his statement should be acted upon by the person and in the manner reasonably contemplated; the bearer's ignorance of the falsity of the statement; his reliance on its truth; his right to rely thereon; and his

consequent and proximately caused injury.

*Ackmann v. Keeney-Toelle Real Estate Co.*, 401 S.W.2d 483, 488 (Mo.1966). *See also Wilburn v. Pepsi Cola*, 410 F.Supp. 348, 351 (E.D.Mo.1976) (applying Missouri law); *Wood v. Robertson*, 245 S.W.2d 80, 82 (Mo. 1952). It is clear beyond any doubt that causation in fact is an essential element of an action for common law fraud under Missouri law. *See Jones & Laughlin Steel Corp. v. Sedalia Industrial Loan and Investment Co.*, 315 F.2d 58, 61–62 (8th Cir. 1963) (applying Missouri law); *Bales v. Lamberton*, 322 S.W.2d 136, 138 (Mo.1959) ("Where a party has not sustained any damages as a result of the fraud charged, it is the general rule that no action for damages may be maintained."); *Mills v. Keasler*, 395 S.W.2d 111, 118 (Mo.1965). Accordingly, since no causation in fact existed as a matter of law in this case for the reasons expressed in Part II of this opinion, the plaintiffs' common law fraud claim must fail.

### B. Breach of Fiduciary Duty.

We lastly consider the merits of the plaintiffs' claim that the defendants breached their fiduciary duty of good faith in enforcing the stock restriction. Again, we accept the district court's choice of law—Delaware law controls the disposition of

19. We thus have no occasion to pass on the question of the defendants' obligation to those shareholders who voluntarily retired or otherwise voluntarily triggered the operation of the stock restriction during the period preceding the public offering.

20. We accept the district court's choice of law with respect to the common law fraud claim. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) requires that we look to the forum state, Missouri in this case, to determine what substantive law to apply. Missouri has embraced the most significant contacts doctrine of the Restatement (Second) of Conflict of Laws § 145 (1971) in tort cases, *see Kennedy v. Dixon*, 439 S.W.2d 173, 184–185 (Mo.1969); *State ex rel. Broglin v. Nangle*, 510 S.W.2d 699, 700 (Mo. 1974); *Trzecki v. Gruenewald*, 532 S.W.2d 209,

211 (Mo.1976), which classification includes actions for common law fraud, *see General Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1215–1216 (8th Cir. 1973), *cert. denied*, 414 U.S. 1162, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974); Restatement (Second) of Conflict of Laws §§ 145, 148(2) (1971). Since the plaintiffs are all Missouri citizens and their alleged reliance and pecuniary harm occurred in Missouri, we defer to the holding of the district court that Missouri had the most significant relationship to the transaction. Restatement (Second) of Conflict of Laws § 148(2) (1971).

21. Liability for fraud may be premised on a nondisclosure or omission as well. *See Wilburn v. Pepsi Cola*, 410 F.Supp. 348, 351 (E.D. Mo.1976) (applying Missouri law); *Miller v. Higgins*, 452 S.W.2d 121, 124 (Mo.1970).

this claim. Restatement (Second) of Conflict of Laws § 309 (1971).[22]

▇▇▇▇▇ Although directors generally do not occupy a fiduciary position with respect to stockholders in face to face dealings, Delaware law does create such a duty in special circumstances where advantage is taken of inside information by a corporate insider who deliberately misleads an ignorant stockholder. *See Kors v. Carey*, 39 Del.Ch. 47, 158 A.2d 136, 143 (1960); *Lank v. Steiner*, 43 Del.Ch. 262, 224 A.2d 242, 245 (1966). Implicit in this formulation of the rule is the element of causation: the stockholder must rely on the misleading representation or omission in order to establish a cause of action for breach of fiduciary duty. *Id.*

▇▇▇ As we have previously noted, any information concerning the public offering could not have subjectively influenced the plaintiffs to act differently than they did act in selling the shares to the corporation pursuant to the terms of the stock restriction. The parties were "influenced" only by 1) the lawful execution of the stock restriction, which contractually bound them to sell the stock on the contingency of

death, and 2) the death of Kenneth Bitting. The defendants thus had no duty to disclose any information concerning the public offering, since such information was irrelevant to the plaintiffs' investment decision.[23]

The judgment is reversed and the case is remanded with directions to dismiss the complaint.

HEANEY, Circuit Judge, dissenting.

I respectfully dissent. I cannot agree with the majority's holding that no breach of a fiduciary duty under Delaware law occurred. The defendants exercised the repurchased options of deceased shareholders for no justifiable business reason. By arbitrarily inflicting injury on a class of shareholders, the defendants failed to exercise that good faith and fair dealing required by Delaware law.[1] *See, e. g., Petty v. Penntech Papers, Inc.*, 347 A.2d 140 (Del.Ch. 1975); *Speed v. Transamerica Corp.*, 99 F.Supp. 808 (D.Del.1951), *aff'd*, 235 F.2d 369 (3rd Cir. 1956); *Condec Corporation v. Lunkenheimer Company*, 43 Del.Ch. 353, 230 A.2d 769 (1967).

The majority correctly states that § 202(c)(1) of the Delaware General Corpo-

---

**22.** The Restatement (Second) of Conflict of Laws § 309 (1971) provides as follows:

> The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders, except where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied.

**23.** The plaintiffs invoke the familiar principle of Delaware law that a duty of good faith dealing is superimposed on the terms of every contract arising in the corporate framework. *See Guth v. Loft*, 23 Del.Ch. 255, 5 A.2d 503 (1939); *Condec Corp. v. Lunkenheimer Co.*, 43 Del.Ch. 353, 230 A.2d 769 (1967); *Penn Mart Realty Co. v. Becker*, 298 A.2d 349 (Del.Ch. 1972). They reason that even valid corporate machinery cannot be used for any improper motive to injure minority shareholders. *See, e. g., Yasik v. Wachtel*, 25 Del.Ch. 247, 17 A.2d 309 (1941); *Condec Corp. v. Lunkenheimer Co., supra; Petty v. Penntech Papers, Inc.*, 347 A.2d 140, 143 (Del.Ch.1975).

We have no quarrel with these propositions in the contexts in which they were invoked. However, none of the cases cited by the plaintiffs involved nor control the enforceability of a stock option lawfully executed under Delaware law and legally enforceable under § 202(c)(1) irrespective of specific justification. *Cf. Singer v. Magnavox Co.*, 367 A.2d 1349, 1353–1358 (Del.Ch.1976). None of these cases even remotely impugns the company's right to exercise a repurchase option which was specifically assented to by the stockholder, consistently exercised by the company and supported by lawful business purposes.

**1.** The defendants would escape responsibility for their actions on the theory that they did not personally exercise any options. I am not persuaded by that defense. The defendants by failing to disclose the decision to go public to those who were responsible for exercising the options made the exercise inevitable. The defendants were well aware of the substantial harm that would occur to shareholders who had their stock redeemed after the decision to go public was made but before the registration was made effective. *St. Louis U. Tr. Co. v. Merrill Lynch, Pierce, Etc.*, 412 F.Supp. 45, 50 (E.D.Mo.1976).

ration Law permits repurchase options as well as rights of first refusal. Such options are not uncommon, especially in close corporations, and serve legitimate business purposes. It also appears that § 202(c) was designed to broaden the circumstances in which transfer restrictions would be allowed. On its face, this transfer restriction was enforceable under Delaware law.

However, the majority's apparent holding, that a repurchase option may be exercised in all circumstances or for any purpose because it no longer must be supported by a specific justification, cannot be supported.

Section 202(c)(1) may limit a court's inquiry into the reasonableness of the transfer restriction, but it does not foreclose further inquiry into the circumstances of its exercise. Such circumstances may be examined even though the articles or by-laws specifically authorize the transaction. *Petty v. Penntech Papers, Inc., supra; Schnell v. Chris-Craft Industries, Inc.*, 285 A.2d 437 (Del.1971); *Condec Corporation v. Lunkenheimer Company, supra.* The defendants may not merely take refuge in strict compliance with the provisions of Article VI as "inequitable action does not become permissible simply because it is legally possible." *Schnell v. Chris-Craft Industries, Inc., supra* at 439. When dealing with shareholders as a class, control persons have a fiduciary obligation to them, "especially where [the shareholders'] individual interests are concerned." *Petty v. Penntech Papers, Inc., supra* at 143. *And see Kors v. Carey*, 39 Del.Ch. 47, 158 A.2d 136 (1960); *Lofland v. Cahall*, 13 Del.Ch. 384, 118 A. 1 (1922). This fiduciary duty requires control persons to exercise good faith and fair dealing. Here, the defendants breached that duty.

Central to the argument that defendants breached their fiduciary duty is the fact that defendants were firmly committed to going public no later than November 18, 1970, the date the option on Bitting's stock was exercised. The trial court fixed the date when the defendants decided to go public as July 14, 1970. While I feel this finding is not clearly erroneous, strong additional evidence exists to indicate that the decision became more entrenched by November 18, 1970. The following facts tend to support this conclusion:

In March and June, 1970, the New York Stock Exchange took action to permit public ownership of member firms and to eliminate the limitations on nonvoting stockholders in member firms. This action coincided with the demonstrated need of Merrill Lynch for additional capital thus establishing the legal basis and economic justification for going public.

On July 14, 1970, a meeting of the defendants was held and a decision to go public was made.

In late July, 1970, the "going public" Task Force was created. It prepared a preliminary timetable calling for the filing of a registration statement with the Securities and Exchange Commission prior to March 31, 1971.

On August 26, 1970, the defendants engaged the accounting firm of Haskins and Sells to perform a ten-year audit of the company and to prepare the financial statements necessary for the registration statement. This audit, which cost Merrill Lynch $400,000 and involved 15,000 accountant hours, is of a type that would not have been made absent a firm intention to go public.

Prior to October, 1970, a legal audit committee was established. On October 7, 1970, a mid-point report on the legal audit was submitted to the Task Force. The report stated: "We are now slightly more than half through the Corporation Accounting and Legal Audit Timetable." The report set forth a timetable that fixed a March 1, 1971, date for filing a registration statement with the S.E.C. This was a full month earlier than that fixed in the preliminary timetable.

On November 18, 1970, a meeting was held with the S.E.C. to discuss the presentation of the Goodbody financial statements in the prospectus.[2] By classifying Good-

---

2. Goodbody, the fifth largest brokerage firm in the country, was rescued from financial collapse by Merrill Lynch at the urgent request of the New York Stock Exchange in November, 1970.

body as a nonsignificant subsidiary, separate financial statements of that company were not required in the Merrill Lynch prospectus.

Other significant actions were taken within a few months of Mr. Bitting's death. These are important to the extent they lend support to the finding that a decision to go public had been made prior to November 18. Included in these actions are the following:

On December 30, 1970, the defendants determined the size of the offering and decided on a three-for-one stock split prior to the offering. They also concluded that necessary amendments to the articles would be submitted to the Board in March and voted on at the annual stockholders meeting in April.

By January 5, 1971, the first draft of the registration statement was completed. It contained a proposed filing date of March, 1971.

The defendants minimize the importance of the actions listed above and argue that they do not support a finding of a firm intent to go public. They argue that since the registration process could be halted at any time before the registration statement became effective, no final decision was made until the registration process could not be aborted. I find little merit in this argument. The possibility that the defendants could abort the process if later events demanded it does not negate a present intent to go public.

Moreover, it would have been simple and fair to have suspended the exercise of options during any period of uncertainty.[3]

The gravamen of defendants' breach is utilizing a corporate power to seriously injure a shareholder class[4] without a business justification.[5] *See Petty v. Penntech Papers, Inc., supra; Schnell v. Chris-Craft Industries, Inc., supra; Condec Corporation v. Lunkenheimer Company, supra; Voege v. American Sumatra Tobacco Corporation,* 241 F.Supp. 369 (D.Del.1965); *Speed v. Transamerica Corp., supra.*[6] The plaintiffs are within the injured class of shareholders and should be allowed recovery.[7]

The seriousness of the injury to the deceased shareholder class is best illustrated

---

3. The defendants could have alleviated any problems with the running of the ninety-day option period by explaining their intentions to the plaintiffs and working out an agreement extending the option period.

4. The shareholder class is composed of those shareholders who died between July 14, 1970 and April 9, 1971. The latter is the date when defendants discontinued the policy of exercising options to repurchase stock.

5. Neither can the defendants claim a business justification. The business reasons set forth as a justification in n. 17 of the majority opinion did not suddenly disappear on April 9, 1971, when the decision was made to discontinue exercising options.

6. Arguably, some improper purpose or self-dealing must be present to find liability. But fraud and self-dealing are not the sole methods of breaching a fiduciary duty. *Penn Mart Realty Company v. Becker*, 298 A.2d 349 (Del.Ch. 1972). A fiduciary need not personally benefit from a transaction constituting a breach. *See, e. g.,* G. Bogert, *Trusts and Trustees* § 543 (2d ed. 1960).

The trial court found that the defendants' actions were part of a scheme to maintain management control and to increase earnings per share so as to increase the public offering price of Merrill Lynch shares. Maintenance of control is an improper purpose under Delaware law. *See, e. g., Bennett v. Propp*, 41 Del.Ch. 14, 187 A.2d 405 (1962). Although unnecessary to this decision, substantial evidence exists to support the trial court's findings.

Moreover, when all transactions, including those of stockholders who retired in the interim period when the stock was repurchased are considered, the direct gain to the defendants was substantial.

7. This case presents only the issues relating to deceased shareholders and not to those shareholders who voluntarily retired. In *Ayres v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 538 F.2d 532 (3rd Cir. 1976), *cert. denied*, 429 U.S. 1010, 97 S.Ct. 542, 50 L.Ed.2d 619 (1976), the Court accurately observes that the decision to retire was, in effect, a voluntary decision to sell as the shareholder could have retained the stock if he had not elected to retire. In my judgment, *Ayres* was properly decided.

by the plaintiffs' situation. The plaintiffs' stock was redeemed at $26.597 per share. Thereafter, Merrill Lynch split its stock three-for-one and sold it for $28.00 per share.

The trial court determined that at the time the option was exercised, the pre-split value of plaintiffs' stock was $75.00 per share for a loss of $48.403 per share. As plaintiffs owned 30,000 shares, actual damages were computed of $1,452,090.[8] If the plaintiffs had retained the stock until June 23, 1971, when Merrill Lynch went public, the pre-split value would have been $84.00 per share and the loss in excess of $1.7 million.

The defendants' breach of their fiduciary duty is sufficient to sustain the award of actual damages by the trial court. This being the case, it is unnecessary for me to decide whether the plaintiffs established a violation of § 10(b) and Rule 10b–5. I would only note that, in my judgment, *Ryan v. J. Walter Thompson Co.,* 453 F.2d 444 (2d Cir. 1971), *cert. denied,* 406 U.S. 907, 92 S.Ct. 1611, 31 L.Ed.2d 817 (1972), was improperly decided.

The trial court should not have awarded punitive damages. The defendants' actions were not the willful, wanton and malicious type of conduct that punitive damages were designed to punish and deter. *See, e. g., Genie Machine Products, Inc. v. Midwestern Machinery Co.,* 367 F.Supp. 897 (W.D.Mo. 1974).

Neither should the trial court have awarded prejudgment interest. Although equitable principles may be considered, generally Missouri law does not allow prejudgment interest on an unliquidated sum. *General Insurance Co. of America v. Hercules Construction Co.,* 385 F.2d 13 (8th Cir. 1967). *See* V.A.M.S. §§ 408.020 and 408.040.

In all other respects, the judgment should be affirmed.

---

**8.** Kenneth Bitting owned 40,000 nonvoting shares at the time of his death, but his widow was allowed to repurchase 10,000 at the redemption price from Merrill Lynch.