OWENS ILLINOIS, INC.

v.

LAKE SHORE LAND COMPANY, INC.

Civ. A. No. 77–38 Erie.

United States District Court,
W. D. Pennsylvania.

Sept. 27, 1978.

---

John J. Stroh, Jr., Erie, Pa., for plaintiff.

Eugene J. Brew, Jr., Erie, Pa., for defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT, DISCUSSION, AND CONCLUSIONS OF LAW

KNOX, District Judge.

### A. Introduction

The complaint as originally filed March 15, 1977, in this case sought a declaratory judgment with respect to provisions of an option agreement covering real estate in Lake City Borough and Girard Township, Erie County. There followed considerable preliminary skirmishing much of it result-

ing from failure of defendant to cooperate in discovery, litigation resulting from defendant's demands for jury trial, and arguments with respect to joinder of Jeannette Corporation as a party.

The date for conveyance of the property, October 1, 1977 having passed plaintiff amended its complaint to include a prayer for specific performance. A late filed counterclaim was dismissed without prejudice to filing a separate action.

A non jury trial scheduled for December 27, 1977 was frustrated by defendant filing a petition for mandamus in the United States Court of Appeals and seeking a subsequent stay from the U.S. Supreme Court. Non jury trial was finally commenced March 21, 1978.

The matter has since been briefed and argued and the court makes the following:

## B. Findings of Fact

(1) Plaintiff Owens Illinois, Inc., is an Ohio Corporation with its principal place of business at 405 Madison Avenue, Toledo, Ohio. (Tr. 281)

(2) Defendant Lake Shore Land Company, Inc. is a Pennsylvania corporation with its principal place of business at 704 Sassafras Street, Erie, Pennsylvania. (Tr. 102)

(3) The amount in controversy exceeds the sum of $10,000, exclusive of interest and costs. (Tr. 281)

(4) Lake Shore Land Company, Inc., is a closely-held corporation owned and operated by the families of Robert F. Painter and Douglas Painter. Robert F. Painter is President and Director of Lake Shore Land Company, Inc. Douglas Painter is Vice President, Secretary, and a Director of Lake Shore Land Company, Inc. (Tr. 102, 183)

(5) Robert F. Painter, age 54, is knowledgeable in the areas of real estate and construction. He is a registered engineer who has been involved in the construction business for 30 years. He is President of United Atkinson, Inc., general contractors of Erie, Pennsylvania. He received a BS in mechanical engineering from Penn State University in 1943. (Tr. 136,9)

(6) Douglas Painter, age 49, is knowledgeable in the areas of real estate, insurance and law. In addition to his interest in Lake Shore Land Company, Inc., he has a real estate and insurance company in Erie, Pennsylvania, known as Painter and Company, a real estate company in Cleveland, Ohio, known as Painter Realty Company, and a law office in Cleveland, Ohio known as McGuinness, Painter & McGuinness. He also is Secretary of United Atkinson, Inc. of Erie, Pennsylvania. Douglas Painter received a BS in commerce and finance from the University of South Carolina in 1949 and a JD from Western Reserve University in 1967. He has been licensed to practice law in the State of Ohio since 1967. (Tr. 181,3, 225,6)

(7) On April 19, 1967, Owens Illinois, Inc. and Lake Shore Land Company, Inc. executed a separate Lease Agreement for a term of 15 years with a right of extension for additional five year terms to 1992, covering a 4.078 acre tract partly in Lake City Borough and partly in Girard Township, Erie County, Pennsylvania. (Tr. 25)

(8) On April 19, 1967, Owens Illinois, Inc. and Lake Shore Land Company, Inc. executed a separate Option Agreement whereby Owens Illinois, Inc. was given the right to purchase from Lake Shore Land Company, Inc. the said 4.078 acre parcel of land situate partly in the Borough of Lake City and partly in the Township of Girard, Erie County, Pennsylvania. (Tr. 25)

(9) This Option Agreement recites separate consideration of $10 cash in hand paid by Owens Illinois, Inc. to Lake Shore Land Company, Inc. in return for the grant of the option, in addition to further consideration of the execution of a separate Lease Agreement covering the same property.

(10) The term of the Lease Agreement was to commence upon completion of the construction by Lake Shore Land Company, Inc. of a warehouse addition to an existing manufacturing building located on adjoining property owned by Owens Illinois, Inc. The Owens Illinois, Inc. property is to the

south and east of the property which is subject to the Option Agreement and the Lease Agreement, and there is a party wall between the warehouse facility to the north on the Lake Shore Land Company, Inc. property and the existing manufacturing building on the south located on Owens Illinois, Inc. property. (Tr. 28–30)

(11) The warehouse addition was completed by Lake Shore Land Company, Inc. in 1967, and by agreement of the parties the initial lease term commenced on October 1, 1967 and was to run until September 30, 1982. (Tr. 29–31)

(12) Both the Option Agreement and the separate Lease Agreement were not form agreements, and both were the subject of back and forth negotiations between Robert F. Painter, Douglas Painter and Eugene Brew, Esquire on behalf of Lake Shore Land Company, Inc. and Harvey Minton, Joe D'Italia and Don Koepfler on behalf of Owens Illinois, Inc., which negotiations resulted in substantial page and paragraph changes on the original drafts of the two agreements. The result was an agreement negotiated at arms length on both sides. There was no overreaching. (Tr. 226,7, 231,2, 297–300, 303–305)

(13) Under paragraph 23 of the Lease Agreement, Owens Illinois, Inc. had the option to require Lake Shore Land Company, Inc. to build an addition to the warehouse facility which had been constructed by Lake Shore Land Company, Inc. in 1967. This option to require additional construction had to be exercised during the first three years of the lease term commencing on October 1, 1967, or prior to September 30, 1970.

(14) Owens Illinois, Inc. chose not to exercise its option to have Lake Shore Land Company, Inc. construct this addition to the warehouse facility during this three year period. (Tr. 93)

(15) Under paragraph 15 of the Lease Agreement, Owens Illinois, Inc. could not assign or sublet the 4.078 acre parcel without the written consent of Lake Shore Land Company, Inc. but Lake Shore Land Company, Inc. could not unreasonably withhold its consent. No consent, however, would be necessary if the assignment or subletting were made to a subsidiary or affiliate of Owens Illinois, Inc. or to any corporation in which Owens Illinois, Inc. had a controlling interest but lessee should remain liable.

(16) On December 7, 1978, George Pavuk of Owens Illinois, Inc. telephoned Robert F. Painter, President of Lake Shore Land Company, Inc., to request permission to sublease the 4.078 acre parcel of property. Pavuk obtained Painter's oral consent on that date. (Tr. 57, 114,5)

(17) Lake Shore Land Company, Inc. then provided Owens Illinois, Inc. with written permission to sublease the parcel by letter of December 11, 1972, signed by Robert F. Painter, President, and Douglas Painter, Secretary. (Tr. 51, 70)

(18) On December 21, 1972, Lake Shore Land Company, Inc. sent a letter to Northeastern Ohio National Bank, the mortgagor of their 4.078 acre parcel, advising that Lake Shore Land Company, Inc. had given its consent to sublease the parcel and enclosing newspaper clippings from the Wall Street Journal and Erie Times setting forth the involvement of Jeannette Corporation. (Tr. 144–149)

(19) Jeannette Corporation (Jeannette) is a publicly-held Pennsylvania corporation of sufficient stature that Northeastern Ohio National Bank was agreeable to any assignment of the mortgage from Lake Shore Land Company, Inc. to Jeannette Corporation, if the need should arise.

(20) Lake Shore Land Company, Inc. had actual knowledge in December, 1972, that Jeannette Corporation was not a subsidiary, affiliate, or controlled corporation. If Owens Illinois, Inc. and Jeannette were related corporations, there would have been no need for Owens Illinois, Inc. to seek the consent of Lake Shore Land Company, Inc. under paragraph 18 of the Lease Agreement. (Tr. 144–149)

(21) There was no reason for Lake Shore to withhold consent to a sublease to Jeannette and to withhold such consent would have been unreasonable.

(22) Pursuant to the written permission of sublease granted by Lake Shore Land Company, Inc.'s letter of December 11, 1972, Owens Illinois, Inc. entered into an Agreement to Sublease with Purchase Option with Jeannette on January 15, 1973. This Agreement covered the 4.078 acre parcel of land which is subject to the Option Agreement and the separate lease agreement between Owens Illinois, Inc. and Lake Shore Land Company, Inc. (Tr. 50–52, 60–62)

(23) On January 15, 1973, Owens Illinois, Inc. and Jeannette entered into a separate Plan Lease with Purchase Option covering the property owned by Owens Illinois, Inc. which was to the south and east of the 4.078 acre parcel of land which is subject to the Option Agreement and the separate Lease Agreement between Owens Illinois, Inc. and Lake Shore Land Company, Inc. This separate parcel of land owned by Owens Illinois, Inc. is not involved in this action.

(24) On January 15, 1973, Owens Illinois requested a further letter from Lake Shore specifically naming Jeannette as subtenant. Robert F. Painter stated that he would get such a letter in the mail that day or the next day, and Owens Illinois, Inc. then executed the agreement with Jeannette to sublease with purchase option. (Tr. 49, 50)

(25) Despite the representation made by Robert F. Painter during the January 15, 1973 telephone conversation with Harvey Minton, Lake Shore Land Company, Inc. failed to provide the promised letter specifically naming Jeannette Corporation as the approved subtenant. (Tr. 52, 58)

(26) Under paragraph 19 of the option Owens Illinois had the right to purchase the 4.078 acre piece at the end of any five year lease period for a declining purchase as fixed in said paragraph 1. The tenth lease year or second five year lease period expired September 30, 1977.

> "Optionee may exercise this option during the term of the Lease or additional terms in the manner hereinafter set forth to consummate the purchase of the property at the end of any five year lease period."

(27) Pursuant to Paragraph 3 of the option agreement between Owens Illinois, Inc. and Lake Shore Land Company, Inc., Owens Illinois, Inc. exercised its option to purchase the 4.078 acre parcel of land at the end of the tenth lease year, i. e., September 30, 1977, by letter of July 2, 1976 sent by registered mail and received by Lake Shore Land Company on July 6, 1976. (Tr. 31–33)

(28) The option agreement provided in paragraph 9 that the purchase shall be closed at a designated place "or at such other place as the optionee shall direct not more than 120 days after the exercise of the option". It was, however, also provided in paragraph 4 that optionor will provide optionee with an interim binder for title insurance within 45 days after exercise. This was never provided by optionor which did nothing.

(29) By letter of December 15, 1976, Douglas Painter on behalf of Lake Shore Land Company advised Owens Illinois that Lake Shore was refusing to convey title to the property subject to the option agreement at any time. (Tr. 33,4) The purported reason was "The violation of the lease option agreement by Owens Illinois". The nature of the violation was not stated.

(30) Owens Illinois has been and is ready, willing and able to pay the $92,000 purchase price under the option agreement, but Lake Shore has refused to perform its obligations under the option agreement or to tender a deed and continues to refuse to do so at any time. (Tr. 35, 96,7)

(31) Paragraph 16 of the lease agreement between Owens Illinois and Lake Shore Land Company contains the sole procedure for declaring a default and subsequent termination of the lease between the parties covering the 4.078 acre parcel of land. In the event that Owens Illinois is in default of its obligation to pay rent or perform any other terms or provisions of the lease, Lake Shore Land Company, Inc. must provide written notice of the default. Owens Illinois, Inc. then has a 30-day period from receipt of the notice to cure the default. If the default is not cured within the 30-day

period, Lake Shore, at its option, may terminate the Lease Agreement by written notice of termination within six months thereafter if the default is continuing.

(32) Lake Shore Land Company, Inc. failed to provide Owens Illinois, Inc. with any written notice of default under paragraph 16 of the Lease Agreement until sending its letter of June 14, 1977, after the exercise of the option and after commencement of this lawsuit. This letter refers to an alleged default of paragraph 15 of the Lease Agreement dealing with subleasing and an alleged default of paragraph 8 of the Lease Agreement dealing with fire insurance and is the only written notice of default which ever has been sent pursuant to paragraph 16 of the Lease Agreement. (Tr. 87, 163)

(33) Lake Shore had claimed that Owens Illinois, was in default of paragraph 8 of the Lease Agreement for carrying a $5,000 deductible on the fire insurance policy covering the 4.078 acre parcel in question. Although Owens Illinois, Inc. disputed that this deductible constituted a violation of paragraph 8, the deductible was removed at the request of counsel effective May 11, 1977, and there never has been any fire loss to the property. The alleged default was therefore harmless and timely cured. (Tr. 199, 204)

(34) Although not mentioned in the written notice of default dated June 14, 1977, Lake Shore Land Company also objected to the form of certificate of liability insurance because the provision which named Lake Shore Land Company, Inc. as an additional insured did not have a signature thereunder. Although Owens Illinois, Inc. disputed that the certificate was improper Owens Illinois presented Lake Shore Land Company, Inc. with a certificate which satisfied its obligation under paragraph 13 of the Lease Agreement. (Tr. 285–286)

(35) In any event, Lake Shore failed to give written notice of termination of the Lease Agreement within six months from the end of the period for cure as required by paragraph 16 of the Lease Agreement, but instead chose to continue the Lease Agreement between the parties despite the alleged defaults. (Tr. 176–177)

(36) On the morning of March 22, 1978, prior to beginning the second day of trial, Lake Shore sent a letter to Owens Illinois containing a notice of termination under paragraph 16 of the lease agreement which referred only the "failure to correct" an alleged default regarding the subleasing to Jeannette Corporation. The letter does not mention insurance. This written notice was not given within the required six month period.

(37) From the commencement of the lease term on October 1, 1967 up through the time of trial, Owens Illinois, Inc. has continued to pay, and Lake Shore Land Company, Inc. has continued to receive and have credited to its mortgage account with Northeastern Ohio National Bank, rental payments in the amount of $975. per month. At no time has Lake Shore Land Company, Inc. refused to accept these monthly rental payments and treat the Lease Agreement as terminated. (Tr. 36–40)

## C. Discussion

■ While this case was originally commenced as an action for declaratory judgment under 28 U.S.C. § 2201, it has since become as the result of the passage of the date, i. e., October 1, 1977, for the transfer of title a pure and simple equity action for specific performance of a contract to convey real estate. It is a diversity action and since the land lies in Erie County Pennsylvania, the laws of Pennsylvania apply. Defendant throughout this litigation has evinced a settled intention to grasp at all available straws to avoid its obligation to convey this real estate pursuant to the option which it executed.

■ Defendant of course does have the right to insist that the option be exercised precisely in accordance with its terms. The court however holds that it has been so exercised and that an order for specific performance must be entered under the findings of fact above set forth.

(1) Was the option exercised at the proper time in accordance with its terms? It will be noted under paragraph 1 the optionee may exercise this option during the term of the accompanying lease at the end of any five year lease period. Since the lease commenced October 1, 1967, the first five year lease period ended September 30, 1972 and the second five year period ended October 1, 1977. Paragraph 3 provided for method of exercising the option and provided "such notice shall be mailed not less than 45 days prior to the expiration of the lease year at the end of which the sale is to be consummated". Thus it appears that the lease period referred to at the end of which the option could be exercised was at the end of the second five year period since the first five year period had elapsed without any attempt to exercise the option. This date was clearly October 1, 1977.

On July 2, 1976, a notice of exercise of option in accordance with the terms of the agreement was sent on July 2, 1976, to the defendant by registered mail and received by defendant on July 6, 1976. (See P. Ex. 4). The notice clearly provided that the exercise was to be at the end of the tenth year period ending September 30, 1977.

■ It will be noted that nothing forbids the exercise of the option *more* than 45 days before the expiration of the five year term and there is nothing which requires that the option be exercised during the tenth lease year as contended by defendant. It is the defendant's contention apparently that notice of exercise of the option had to be sent exactly 45 days before the expiration of the ten year period but this is not what the agreement provides. If it was the intention of the parties to tie themselves to such a rigorous schedule the clause would have read "such notice shall be mailed not more nor less than 45 days prior to the expiration of the lease year . . .". In other words the notice of exercise of the option had to be given on August 16, 1977, or not at all. The defendant complains that the notice of exercise of the option was given too soon but how defendant was harmed by this is not apparent.

It further appears that to send a later notice during the last year of the ten year term would have been futile and useless in view of the letter sent by defendant to plaintiff on December 15, 1976, (P. Ex. 8) which plainly says "your request for settlement is refused. The violation of lease option agreement by Owens Illinois precludes the formation of a contract for sale of the property; therefore we do not intend to convey title on the days you suggest, *or any day* ".

■ In view of this flat refusal and repudiation of its obligations under the option agreement plaintiff was not required to send any further notices. The law does not require a party in such a situation to do a vain and useless thing. See Restatement of Contracts, § 306. *Unatin Seven Up Co. v. Solomon,* 350 Pa. 632, 39 A.2d 835 (1934). In any event this suit was filed March 15, 1977, during the last year of the ten year period in which plaintiff sought originally a declaration that it was entitled to a conveyance of the property. October 1, 1977, came and went while the parties were skirmishing on preliminary matters in discovery and defendant still did nothing to comply with its obligation.

Defendant contends that closing had to be within 120 days of notice of exercise of the option, under paragraph 9 of the option agreement. It will be noted that there is nothing in the agreement which makes the exercise of the option dependent upon closing within 120 days. The closing within 120 days was dependent upon optionor complying with paragraph 4 of the agreement to provide optionee in 30 days with an interim binder for title insurance policy covering the property and this requirement was never performed by optionee which will not be permitted to take advantage of its own default as an excuse.

■ The court considers the 120 day clause in paragraph 9 to be for the benefit of the optionee in the event the option was exercised 45 days before the end of the year in which case the parties had 120 days to close and this would prevent dilatory tactics

**904**

by optionor or optionee for that matter with respect to closing. This matter was not raised as a reason for the absolute refusal to convey under any circumstances contained in the letter of December 15, 1976, and if applicable would therefore be considered waived.

The court is at a loss to see how the defendant was harmed by giving of notice on July 2, 1976, to exercise the option effective at the end of the term expiring September 30, 1977. This obviously gave the parties plenty of time to make adjustments and to arrange for title searches and title insurance and other details of closing. Defendant obviously would be entitled to its rent up to the end of the ten year period ending September 30, 1977, and this could be adjusted at time of closing.

(2) Default by Plaintiff. Defendant's second line of defense is that the plaintiff has defaulted under the terms of the lease and hence is not entitled to specific performance of the option to purchase. The alleged defaults pertain to granting a sublease of the premises or assignment to Jeannette Corporation which is presently in possession.

(3) Violation of the insurance clause in that the policy provided for a $5,000 exclusion from coverage and failure to name Lake Shore Land Company and Jeannette Corporation as interested parties under the Insurance coverage.

The court holds that the option agreement and the lease agreement were entirely separate documents and even if there were default under the terms of the lease agreement this cannot be used as a defense to an action for specific performance to the option.

■ The law of Pennsylvania is clear that an option in a lease is treated as an entirely separate agreement and without express language in the contract that default in the lease shall prevent securing of specific performance of the option, such default will be no bar. The law in this area was summed up in *Myers v. Epstein,* 37 D&C 2d 549 (1965) in these words:

"The option to purchase is not an essential covenant of the lease, nor is it a term and condition of the demise. There are many covenants which are often found in leases which are independent and not essential parts of the demise, which, without express agreement to that effect, are not to be incorporated in renewals thereof, such as a covenant to renew or any covenant that has been fulfilled and is not continuous.

"The option to purchase is an independent clause in the lease, giving the lessee the right to purchase the property within the time specified: *Signor v. Keystone Consistory,* 277 Pa. 504, [121 A. 320.] It may be treated as a part of the agreement insofar as it describes the persons and the property, but it forms no part of the demise and was not necessary for the continuance of the tenancy.

"Judge Laub, in *Felver v. Baumgarten,* 35 Erie 91, referred to the Pettit case and others as follows:

'The Pettit case, for example, in clear and unambiguous language, divorces an option to purchase contained in a lease from the demise itself and holds that the former is an independent covenant, not essential to the latter and referable to it only insofar as it describes the persons and the property. So too, *Parker v. Lewis,* 267 Pa. 382, succinctly decided that a lease containing an option to purchase which had been renewed "under the same conditions" constituted a renewal of the lease terms only and not those of the option. And *Signor v. Keystone Consistory A.A.S.R.,* 277 Pa. 504, [121 A. 320,] is to the same effect, holding that an option is an independent contract which is not extended by a renewal of the lease. Kentucky, at least, seems to be in accord with our law. See *Carter v. Frakes,* 303 Ky. 244, 197 S.W.2d 436.' "

■ While *Myers v. Epstein* is a lower court case, nevertheless the Supreme Court of Pennsylvania has clearly so held in respect to this matter in *Pettit v. Tourison,* 283 Pa. 529, 129 A. 587, and *Signor v. Keystone Consistory,* 277 Pa. 504, 121 A. 320.

As stated, the option may be treated as part of the lease for reference to the persons and property covered but otherwise it is not part of the lease and may be assigned separately.

■ The instant case is even of greater strength in establishing this principle since here the option is embodied in a separate agreement and has a separate additional consideration and further specifically states in paragraph 13 that "optionee shall have an unrestricted right to transfer and assign all its rights under this option without the consent of the optionor." This is contrasted with paragraph 15 of the lease where it is provided that the lessee may not assign this lease or sublet the premises without written consent of lessor which shall not be unreasonably withheld. There is nothing in the option agreement which says that default under the terms of the lease is a bar to exercise of the option. This distinguishes this case from Gateway Trading Company v. Children's Hospital, 438 Pa. 329, 265 A.2d 115 (1970). This was a case where the tenant had a right of first refusal and the clause stated "that if the Tenant be not in default under the terms of this Lease or any renewal thereof . . ." This alone distinguishes the case from the case at bar.

■ The court further finds there was no material default under the terms of the lease. The defendant has most strenuously complained that the lease was assigned without written consent by the lessor in violation of paragraph 15. However, defendant's Exhibit P did give consent to an assignment under date of December 11, 1972, "provided that all of the conditions of paragraph 15 are met" which means of course that the lessee would remain liable. Since the lessee still had its obligations and commitments to the lessor this court held that the lessee was a proper real party in interest for the purpose of this action.

■ The court further notes that the clause in question in the lease provides that consent shall not be unreasonably withheld. No sufficient reason has been given as to why consent should not be given to a sub-

letting to Jeannette Corporation a large publicly traded corporation. There is nothing indicated as to Jeannette's financial irresponsibility and therefore the court holds that to refuse to consent to the subletting to Jeannette was unreasonable withholding of consent.

■ Insurance violations—$5,000 deductible. The lease provided in paragraph 8 that lessee should carry fire and extended coverage insurance on the premises. It was therefore not proper for the plaintiff to secure a policy with a $5,000 deductible clause. This defect however was remedied upon demand by the defendant without any default being declared under the lease.

Insurance default (named insured). Defendant was also correct in demanding that the policy name Jeannette Corporation and Lake Shore Land Company as insured. This default however was also promptly remedied and no loss occurred during the period when the insurance was not in proper form and there was no attempt by the defendant to declare the lease forfeited.

In paragraph 16 of the lease it is provided that if there be a default in terms and conditions other than rent and the lessee shall fail to secure such default within 30 days after written notice, then lessor at its option may at once or within 6 months thereafter but only during the continuance of such defaulted condition terminate the lease whereupon the lease shall end. No such notice of termination was given in this case until the second day of trial, well after the lapse of the six month period.

■ It will be noted that a default in conditions under the lease does not forfeit the lease except in accordance with the terms thereof and defendant never declared such forfeiture but continued to accept rent and recognize the relationship between the parties. Such conduct amounted to a waiver of any reliance upon defaults. See English v. Yates, 205 Pa. 106, 54 A. 503 (1903); Paul v. Snyder, 66 D&C 2d 463 (1974).

The court therefore holds that the option agreement is a separate contract from the lease, that the lease is not lugged into the

option agreement in any manner and that any default under the terms of the lease would not in these circumstances be a default under the option or a defense against exercise of the same. Since we hold that the option was validly exercised and that default if any by the tenant under the terms of the lease would not be a defense to this action to enforce the option a decree of specific performance must be entered.

### D. Conclusions of Law

(1) This court has jurisdiction over the parties and the subject matter.

(2) Owens Illinois, Inc. and Lake Shore Land Company, Inc. entered into a valid and enforceable option agreement (P. Ex. 1) on April 19, 1967.

(3) Owens Illinois and Lake Shore entered into a separate lease agreement (P. Ex. 2) on April 19, 1967.

(4) Owens Illinois, Inc. as optionee gave consideration to Lake Shore as optionor for execution of the option agreement which was separate and independent from that given for the lease agreement.

■ (5) Pursuant to paragraph 1 of the option agreement, Owens Illinois, Inc. had a right to exercise its option to purchase the 4.078 acre parcel of land from Lake Shore Land Company, Inc. at the end of the tenth year of the lease, which lease year ended on September 30, 1977.

■ (6) By letter of July 2, 1976, sent by registered mail and received by Lake Shore on July 6, 1976, Owens Illinois made a valid exercise of its option to purchase the property at the end of the tenth year of the lease—September 30, 1977. This exercise was consistent with paragraph 3 of the option agreement which required notice of exercise to be mailed not less than 45 days prior to the expiration of the lease year at the end of which the sale was to be consummated.

■ (7) By letter of December 15, 1976, Lake Shore clearly stated that it refused to convey title to the 4.078 acre parcel of land at any time in breach of the option agreement.

(8) By filing and pursuing their action for declaratory and injunctive relief, Owens Illinois has indicated its continued desire to purchase the 4.078 acre parcel of land under the option agreement.

■ (9) Owens Illinois had no obligation to designate the exact date, time and place of closing under paragraph 9 of the option agreement especially in view of Lake Shore Land Company's continuing refusal to convey title at any time.

(10) Owens Illinois has at all relevant times been ready, willing and able to pay the purchase price under the option agreement but Lake Shore has breached its legal obligations under said option agreement by refusing to execute a deed or to perform its other obligations under the option agreement.

(11) Lake Shore Land Company's claim of an alleged breach of the lease agreement does not affect its obligations under the option agreement because the two agreements are separate and independent, as shown by the separate consideration and the fact that the optionee's rights under the option agreement are freely assignable without the optionor's consent contrary to the terms of the lease agreement, and since there is no provision which declares a forfeiture of the option upon a forfeiture of the lease.

(12) In any event, there has been no forfeiture of the lease because Lake Shore has chosen not to terminate the lease agreement pursuant to paragraph 16 thereof for an alleged default of that lease agreement, but instead has chosen to continue the lease agreement between the parties.

(13) By failing to terminate the lease agreement pursuant to paragraph 16 thereof and by continuing to accept monthly rental payments by Owens Illinois under the lease agreement Lake Shore has waived any right to declare a forfeiture of the lease and thereby affect the validity of the option agreement.

(14) The agreement to sublease with purchase option (P. Ex. 15) constitutes a valid

sublease, and not an assignment, pursuant to paragraph 15 of the lease agreement.

(15) There has been no default under paragraph 15 of the lease agreement because Lake Shore Land Company's letter of December 11, 1972, constitutes the required written consent to sublease.

(16) In any event, Lake Shore could not unreasonably withhold its consent to the sublease to Jeannette Corporation in view of the fact that:

(1) Owens Illinois continued to be responsible for the obligations under the lease agreement,

(2) Jeannette Corporation is a large, publicly held corporation of sufficient financial backing as not to cause any prejudice to Lake Shore and

(3) Lake Shore was not losing a right to build an addition to the warehouse for Owens Illinois because Owens Illinois, Inc.'s right to require that construction expired on September 30, 1970, more than two years prior to the subleasing in question.

 (17) The alleged default in carrying a $5000 deductible on the insurance policy was cured by Owens Illinois was waived by Lake Shore and in any event does not affect any rights and obligations under the separate option agreement.

(18) This alleged default with respect to naming of insureds was cured by Owens Illinois, was waived by Lake Shore, and in any event does not affect any rights and obligations under the separate option agreement.

(19) Owens Illinois has no adequate remedy at law.

(20) Lake Shore is obligated to comply with all terms of the option agreement including the conveyance of 4.078 acre parcel of land by general warranty deed pursuant to paragraph 6 thereof.

(21) Owens Illinois is obligated to comply with all terms of the option agreement including but not limited to the payment of $92,000 pursuant to paragraph 1 thereof, less a credit for all monthly rental payments made after September 30, 1977. At time of trial, these payments to be credited totaled $5,850.

(22) Specific performance will be decreed consistent with these conclusions of law.

(23) Attorneys for the plaintiff are directed to prepare a proper decree of specific performance in accordance with this adjudication and submit the same to the court after notice to the defendant for execution. Such proposed decree shall be submitted within 10 days from the date of this adjudication.