Gateway Trading Co., Inc. *v.* Children's Hospital of Pittsburgh et al., Appellants.

330

Argued October 9, 1969.   Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

reargument refused June 2, 1970.

*Stephen I. Richman,* with him *Greenlee, Richman, Derrico & Posa,* for appellants.

*Richard DiSalle,* for appellee.

OPINION BY MR. JUSTICE POMEROY, April 22, 1970:

This is an appeal from a final decree of the Washington County Court of Common Pleas, sitting in equity, granting plaintiff-appellee's prayer for specific performance of an alleged obligation of defendant Children's Hospital of Pittsburgh to convey to plaintiff certain property situated in Peters Township and declaring invalid a sales agreement for said property which was entered into by the Hospital and the Fourth Allegheny Corporation, defendants-appellants herein.

The facts of the case are as follows: In 1964 one Edith Dawson owned certain land fronting on Route 19 in Peters Township (hereinafter the property) and a building which had been erected thereon. On September 29, 1964 Mrs. Dawson sold the building in question to Gateway Trading Co., Inc. (hereinafter Gateway), the bill of sale giving to Gateway the right to remove the building from the property. Contemporaneously with that sale, Mrs. Dawson leased the property to Gateway for a term of five years at a monthly rental of $150. Attached to the lease was a rider which in pertinent part provided as follows: "[I]t is expressly understood and agreed that if the Tenant be not in default under the terms of this Lease or any renewal thereof, and if the Lessor during the term of this Lease or any renewal thereof receives a bona fide offer acceptable to the Lessor from any person desiring to purchase the demised premises, the Lessor agreed [sic] to give the Tenant ten (10) days notice in writing addressed to the Tenant at the demised premises, by registered mail, setting forth the terms of such offer and the name of the offeror and the lessor's willingness to accept an offer from the Tenant for the purchase of the demised premises for the same amount and in accordance with the same terms as the other offer."

On January 16, 1966, during the term of the lease, Mrs. Dawson died testate. Her will named Adolph L.

Zeman, Esq. as Executor of her estate and Children's Hospital (hereinafter Hospital) as residuary devisee. On September 29, 1966, while settlement of the estate was still pending, Gateway by its President, Paul G. Secoy, transmitted to Mr. Zeman as Executor a check in the amount of $150 in payment of the September rent for the property, then overdue; Secoy further informed Zeman that Gateway was unable to make monthly rental payments of more than $50 to $75 rent in the future, and asked his advice as to the amount of future rental payments. As both Secoy and Zeman testified at trial, Zeman instructed Secoy to suspend further rental payments until arrangements could be made with the Hospital, the devisee. In the following nine months no further rental payments were made or tendered by Gateway.

On December 22, 1966, the Orphans' Court of Washington County by its decree of distribution in Mrs. Dawson's estate awarded the property to the Hospital, which succeeded to all of decedent's rights and obligations under the lease. By a memorandum to the Hospital dated February 2, 1967, Mr. Zeman outlined the situation then existing as to this and other properties devised by Mrs. Dawson. This memorandum stated as follows: "We enclose a letter from Mr. Secoy in which he advises that he is unable to continue to pay the rental at the rate of $150.00 per month as provided for in said lease and offering '$50.00 not to exceed $75.00 per month.' He should be contacted immediately and some understanding reached relative to any reduction in rent, if you are inclined to grant such reduction. Gateway Trading Company, Inc. is delinquent in rent for the month of October, 1966, through February, 1967, at the rate of $150.00 per month."

According to the testimony of John A. Byerly, the Treasurer of the Hospital, he and one William Halboth, a real estate appraiser, visited the property on

March 14, 1967, intending to speak with Secoy and inspect the premises. As to their interview with Secoy, Byerly testified that "we asked him about the rent, he said he couldn't pay that rent; we asked him if he was interested in buying the property, he said no he wasn't." Following the meeting with Secoy, Byerly, on behalf of the Hospital, engaged a local real estate agency with authority to manage the property and arrange for its sale. Thereafter, the real estate agency informed Secoy that it was charged with the responsibility of managing the property and stated that "all future rental payments, as well as any discussion regarding the property" were to be directed to its rental manager. There is no evidence that Secoy approached either the Hospital or the agency concerning a reduction of the rent, and the Hospital did not thereafter attempt to collect the rent then owed.

On April 11, 1967, the Fourth Allegheny Corporation (hereinafter Allegheny) offered to purchase the property at a price of $15,000, hand money of $500 being paid on the date of the agreement, the balance of $14,500 being payable within thirty days upon delivery of the deed. The Hospital accepted Allegheny's offer on April 20; through its agent, it informed Gateway by a letter dated May 1, 1967 that Allegheny had purchased the property. The letter reads: "As per our conversation of April 20, 1967, we apprised you of the fact that the purchase price would be $15,000.00, and as per agreement we offered you this property for the same number of dollars, and you rejected same."[1]   On

---

[1] William Halboth and two employees of the real estate agency testified at trial that they had spoken with Secoy on several occasions about the possibility of his purchase of the property; their testimony was unequivocal that as late as April 20, 1967, Secoy had indicated that he had no interest whatever in purchasing the property. Mr. Secoy testified somewhat equivocally that although real estate agents visited the property, no one had approached him con-

May 2, 1967, Mr. Zeman, on behalf of Gateway, wrote to the Hospital as follows: "We also hastily disclaim that our client [Gateway] rejected an offer of the sale of the property to it. . . . You are advised that the Tenant does hereby exercise its option to purchase the demised premises at the price of $15,000.00 and is prepared to enter into immediate negotiations for the conveyance of the demised premises to the Tenant. Will you please take steps to consummate this transaction in accordance with the terms of the lease and as herein stated."

The instant action was initiated when Gateway filed a complaint in equity in December, 1967. Gateway therein prayed that the defendants specifically perform the agreement contained in the rider to the lease by conveying to Gateway a marketable title to the property and that they be enjoined from conveying the property to any other party or encumbering it in any way. Defendants filed an answer with new matter and a counterclaim for rent allegedly owing.[2] Trial was held, and the Chancellor found for Gateway, entering a decree nisi which ordered conveyance of the property to it for $15,000 and declared the sales agreement between the Hospital and Allegheny invalid. Exceptions were filed by the defendants and overruled by the court

cerning purchase of the property prior to May 1, 1967. There is no evidence that the Hospital ever gave Gateway written notice of the terms of the Allegheny offer, as was required by the lease rider.

[2] On July 7, 1967, Gateway, through Mr. Zeman, had forwarded to the Hospital a check dated June 1, 1967 and drawn in the amount of $1,350.00, representing the delinquent rental payments for the property as the stated rental of $150 per month for the period October 1, 1966 to June 30, 1967. The Hospital held this check and did not submit it for payment; no further rental payments were proffered by Gateway up to the time of the trial of the case although Gateway remained in occupancy of the premises to that date.

*en banc* which entered the Chancellor's decree nisi as a final decree. This appeal followed.

Appellants have presented to this Court four arguments in the alternative: that Gateway never had an option to purchase; that Gateway was in default of its lease and the Hospital was thereby released from any obligation it may have had to convey to Gateway; that Gateway waived any option which it may have had; and that Gateway failed to exercise effectively any such option.

As to the first issue, appellants contend that the lease rider was not a valid option to purchase. Under an option, the optionholder has acquired the power to accept an offer (irrevocable during the option period) by an appropriate means, thereby effecting a binding contract. See Corbin, *Contracts* (1952), Chap. 11; *Restatement (Second) of Contracts,* §24A (Tent. Draft No. 1, 1964). It is true, as appellants point out, that the lease provision here involved gave Gateway no power to effect a contract for purchase, and strictly speaking was not therefore an option.

It is obvious, nevertheless, that the lease rider did constitute a promise by the decedent Dawson, the lessor, binding on her successors in title, that before accepting any offer to purchase made by one not a party to the lease, the lessor would give to Gateway, the tenant, a ten day option to purchase on the same terms. A similar "right of first refusal," as it is commonly called, has been analyzed by Professor Corbin in the following terms: "This contract created no option in either party. If [a third party] should make an offer the owner of the land was privileged not to accept it, and also not to make any offer to the promisee. But the owner was bound by duty not to accept the offer of the [third party] without first giving an option to the promisee." Corbin, *op. cit.* at p. 863. The clear import of the instant rider provision

was that the lessor was obliged to give Gateway written notice of the terms of any bona fide offer which it deemed acceptable and to allow Gateway to purchase the property on those terms before any sale to a third party was effected, provided only that Gateway was not in default under the lease at the time the offer was received. This provision for a right of first refusal was moreover sufficiently definite in its terms that specific performance could be required. See *L. E. Wallach, Inc. v. Toll,* 381 Pa. 423, 113 A. 2d 258 (1955) ; *Lancaster Malleable Castings Co. v. Dunie,* 365 Pa. 95, 73 A: 2d 417 (1950) ; and *Driebe v. Fort Penn Realty Co.,* 331 Pa. 314, 200 Atl. 62 (1938).

There was no evidence in the present case that the Hospital did in fact give Gateway the written notice required by the lease rider. Appellants argue, however, that Gateway's failure to pay the rent for the property from October, 1966 until April, 1967 (the date of the sale agreement between the Hospital and Allegheny) constituted a default within the meaning of the lease, thus negating whatever rights Gateway might have had under the first refusal clause. Gateway contends, and the Chancellor so concluded, that the "postponement" of rental payments owed to the Hospital was permissive and that there was accordingly neither delinquency nor default. Such a conclusion is necessarily premised on Mr. Zeman's statement to Secoy that he (Secoy) could suspend rental payments. It is perfectly clear, however, that Zeman was not an agent of the Hospital, and he was without authority to excuse Gateway from such payments in the period after December 22, 1966, when title to the property passed to the Hospital by virtue of the Orphans' Court decree. Moreover, it should be noted that Zeman in his letter to the Hospital summarizing the status of the devised properties specifically stated that Gateway was delinquent under the lease. There is no evidence that the

Hospital excused Gateway from its rental obligation; absent such evidence we are obliged to conclude that on May 1, 1967, when the Hospital advised Gateway of the Allegheny agreement, Gateway was delinquent under the terms of the lease, and had been so at least from the date of the Orphans' Court decree.

It only remains for us to determine whether, as Gateway contends, the Hospital waived the appellee's default by its offer to sell the property to Gateway during the period when it was in default. While it is clear from the record that the Hospital took no immediate advantage of Gateway's default but rather gave appellee an opportunity to indicate its interest in purchasing the property, this fact does not support appellee's waiver argument. That the Hospital, by its offer, extended to appellee a business courtesy when it was under no contractual compulsion to do so hardly constitutes a waiver of the Hospital's rights under the contract.

To summarize, we conclude that the lease rider gave to Gateway an enforceable right of first refusal subject to the condition that Gateway not be in default under the lease; that Gateway's failure to pay rent at any time between the entry of the Orphans' Court decree and the notice of sale to Allegheny constituted such a default; and that the Hospital did not by its actions waive such default.

The decree is vacated and record remanded for further proceedings in conformity with this opinion. Each side to bear its own costs.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

The majority concludes that Gateway was delinquent under the terms of the lease and that Children's Hospital did not waive that default. There is no question that Gateway paid no rent during the period October 1, 1966-June 30, 1967, and unless some act or

338

event.. excused this nonperformance, Gateway was in default under the lease and not entitled to exercise the option contained in the lease rider. As the majority states, the instructions from Zeman to Secoy could not constitute a valid excuse because Zeman had no authority by which he could have bound Children's Hospital.

It was by the memorandum of February 2, 1967, that the Hospital first learned that Gateway had not been making rental payments, and it never learned that Zeman's statements were. responsible for the nonpayment.[1] The Hospital did not react to this information until March 14 when John Byerly and William Halboth went to see Secoy. At this meeting they asked about the rent, and after Secoy said he could not afford that amount, they asked if he were interested in purchasing the land. On April 20 the real estate agents employed by the Hospital visited Secoy and again asked if he wished to buy. To both inquiries Secoy said "no." On May 1, St. Clair Realty Co. wrote to Secoy stating: "As per our conversation of April 20, 1967, we apprised you of the fact that the. purchase price would be $15,000.00 and *as per agreement* we offered you this property for the same number of dollars, and you rejected same." (Emphasis added).

In my view the question before the Court is whether these offers in the face of nonpayment of rent constitute a waiver of the default. Particularly damaging to Hospital's case is the phrase "as per agreement" in the May 1 letter from its agent to appellee. This indicates that the realty company was attempting to act pursuant to the terms of the rider in spite of. the fact that both it and its principal knew of the nonpay-

---

[1] "Q. Did you ever tell Children's Hospital or the Orphans' Court that you had excused this tenant from paying any rent? A. No, I didn't, because it wasn't the Orphans' Court's business or anybody else's business in the world, but me."

ment of rent. Also the offer of March 14 was made immediately after the Hospital's representatives raised with Secoy the rent question.

The majority states "that the Hospital, by its offer, extended to appellee a business courtesy when it was under no contractual compulsion to do so hardly constitutes a waiver of the Hospital's rights under the contract." To refer to the conduct as "business courtesy" seems more a conclusion than an analysis of the relevant facts and principles of law. The fact is that two offers were made to Secoy when all parties were aware that no rent had been paid for six or seven months. I would not relieve the Hospital from the legal consequences of its actions by suggesting that they were only a "business courtesy". They legally constituted a waiver of the delinquency or they did not. Since I feel they did, Gateway's rights under the rider should be protected and the decree should be affirmed.

I dissent.

Mr. Justice JONES and Mr. Justice EAGEN join in this dissenting opinion.