## DeVries *v.* Westgren, Appellant.

Argued March 22, 1971.   Before BELL, C. J., JONES, EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

reargument refused March 9, 1972.

*Paul H. Titus,* with him *Frances O. Tennant,* and *Kaufman & Kaufman,* for appellant.

*James H. McConomy,* with him *Charles C. Cohen,* and *Reed, Smith, Shaw & McClay,* for appellees.

OPINION BY MR. JUSTICE JONES, December 31, 1971:

Appellees brought an action in equity for specific performance to compel the appellant to offer his shares of stock in Aztec Metals, Inc., to appellees. After a hearing, the court below entered a decree nisi ordering appellant to offer his 360 shares at $60.00 per share. Along with the original exceptions filed by both sides, appellant filed an additional exception requesting that the appellees be ordered to purchase appellant's shares at $60.00 per share. The court below dismissed all exceptions and affirmed the decree nisi. This appeal followed.

Pursuant to a founders agreement, appellant and the appellees executed a stock purchase agreement which pertinently provided: "Upon the termination of employment with the Company of any Individual Shareholder for any reason whatsoever, except for reason of death of such Individual Shareholder, such Individual Shareholder shall offer all of his Common Stock in the manner, upon the terms and at the prices set forth hereafter." After reciting the time and manner of the required offer, the agreement established a formula for determining the price per share: "The price at which each share of Common Stock of the Company is to be offered for purchase . . . shall be an amount equal to the sum of (a) the Base Price per share [$60.00] plus (b) the amount, *if any,* of Accumulated Net Earnings Per Share . . . ." (Emphasis added) Notice of these restrictions was printed on each stock certificate.

It is apparent that this litigation was initiated by the termination of appellant's employment with Aztec

Metals, Inc. Due to the unambiguous language in the stock restriction allowing termination of employment "for any reason whatsoever," the propriety of appellant's discharge has no legal significance in the context of this appeal.

The point stressed by the appellees in the court below and not now contested concerned the price to be paid for each share. Since Aztec Metals, Inc., suffered a loss per share of $110.00, the appellees argued that appellant must transfer his stock for no consideration. Stated differently, appellees contended that the price formula requires that net loss be deducted from the base price per share in order to derive the offering price. We are in complete agreement with the adjudication of the court below that the price formula did not encompass any net loss deduction: "The words 'if any' in the context '. . . plus (b) the amount, if any, of accumulated net earnings . . .' can only mean if there is a plus of accumulated net earnings."

Once it was determined that the price per share would be $60.00, the appellees reversed their stance and stated they no longer wished to buy appellant's shares. Although the terms of the stock restriction do not force the remaining shareholders to acquire the stock and permit a departing shareholder to freely dispose of his stock if the remaining shareholders reject his offer or fail to accept his shares within a specified time, appellant contends that the appellees bound themselves to purchase his shares by filing a bill for specific performance which stated, *inter alia,* that the appellees stand "ready, willing and able to purchase all of [appellant's] shares in Aztec Metals, Inc."

The initial problem presented by this appeal stems from the fact that the stock purchase agreement technically does not create an option but rather a right of first refusal since it does not appear that the appellant

made an irrevocable offer when he executed the stock purchase agreement. *See,* IA Corbin on Contracts §§259-261A (1963); *Gatewood Co. v. Hospital,* 438 Pa. 329, 265 A. 2d 115 (1970). Instead, the appellees seemingly lack any power of acceptance until the appellant first offers his shares. However, unlike a right of first refusal whereby the appellant could elect to retain his shares and never sell to anyone, the stock purchase agreement requires the appellant to offer his shares to the remaining shareholders upon the termination of his employment. In our view, the requirement that appellant offer his shares, whether or not he wished to retain them, lends a quality of irrevocability to the stock purchase agreement and justifies our treatment of this agreement as an option contract. As optionees under this contract, the appellees had but two alternatives—acceptance or rejection. In failing to note that the appellees already possessed a power of acceptance due to the contractual requirement that appellant offer his shares upon discharge, the court below fell prey to the carefully couched language of appellees' complaint which only requested that appellant offer his stock to them. We, therefore, conclude that the appellees accepted and exercised their "option" to purchase appellant's stock when they filed their bill for specific performance. *Cf., Kennedy v. Herring,* 270 Ala. 73, 116 So. 2d 596 (1959); *Nichols v. Sanborn,* 320 Mass. 436, 70 N.E. 2d 1 (1946); 81 C.J.S. *Specific Performance* §47b (1953).

We are of the opinion that any other result would be most injurious to public policy. Although the appellees were "ready, willing and able" to acquire appellant's shares for no consideration, they are not "ready, willing and able" to pay $60.00 per share. Acceptance of the argument advanced by the appellees would allow litigants to utilize a bill for specific per-

formance and indirectly receive an advisory opinion of the price provisions of this stock purchase agreement which is impermissible absent an exercise of the option. *Cf., Philadelphia v. Philadelphia Transportation Co.,* 404 Pa. 282, 171 A. 2d 768 (1961). Moreover, if the appellees are permitted to deny their readiness, *willingness* and ability to perform—the allegations upon which their complaint was based—the appellant and our judicial system will have been needlessly burdened by this litigation. To accept appellees' argument that appellant may now freely dispose of his shares to third persons ignores the economic realities of the situation. Accordingly, the court below is directed to order the appellees to purchase the appellant's shares at $60.00 per share.

The decree, as modified, is affirmed. Costs on appellees.

Mr. Justice EAGEN dissents and would affirm decree of court below.

Mr. Justice POMEROY took no part in the decision of this case.

———

DISSENTING OPINION BY MR. JUSTICE BARBIERI:

I dissent from the action of a majority of this Court in directing that the lower court order the appellees to purchase appellant's shares of stock at $60 per share.

The result reached by the majority grants to the defendant in this case relief which was not requested or put at issue by either party in the pleadings, but first came into the case after entry of the Chancellor's decree *nisi.* This was done by an averment in an "additional" exception filed by the defendant. Thus, the relief granted by this Court was not requested or at issue prior to the Chancellor's adjudication, and granting it solely in response to an averment in an exception seems to me to be a granting of relief upon an untried issue.

While equity has broad discretion to solve all issues, this equity doctrine would not call for a grant of relief which is not supported by the record in the case. *Salisbury Township v. Vito*, 446 Pa. 200, 285 A. 2d 529 (1971); *Dombrowski v. Philadelphia*, 431 Pa. 199, 245 A. 2d 238 (1968).

Plaintiffs' action for equitable relief was brought to require that the defendant comply with his obligation under a stock purchase agreement to *offer* to plaintiffs his stock in the defendant corporation, Aztec Metals, Inc. (Aztec). Since the company had suffered losses, the stock had no value. Defendant was unwilling to offer his stock under the agreement because the formula for fixing the offering price was construed by the plaintiffs, who would be the offerees, to be a "base price" of $60, reduced by losses per share of more than $60. This would have given the defendant a nominal sum or nothing at all for his 360 shares representing approximately 12% of Aztec's common stock. Plaintiffs' suit was to force defendant to *offer* to sell his stock pursuant to the agreement and this was the only relief requested. Defendant, apparently believing that the plaintiffs' reading of the formula for stock valuation was the correct one, filed an answer very simply opposing the relief sought by denying that he was under any obligation to offer "his shares for sale under the present circumstances." In his "NEW MATTER", he set forth certain counter proposals made by him whereby he would transfer the stock to one of the plaintiffs but retain ownership and control "unless the agreement . . . [the stock purchase agreement] . . . had been terminated." Paragraphs 12 and 13 of the defendant's NEW MATTER reads:

"12. In view of the Defendant's large investment of money and effort in Aztec Metals, Inc., it would be manifestly inequitable to force him under the present

circumstances to sell all of his shares in Aztec Metals, Inc. to the other individual shareholders for a small percentage of the investment which he has made in such shares.

"13. To the extent that the other individual shareholders would purchase the shares held by the Defendant in accordance with the formula of the Agreement of December 11, 1968 they would be unjustly enriched at Defendant's expense, in that they would be receiving shares with a value far in excess of the price which they would have to pay for them."

Nowhere in the pleadings does defendant offer to sell for the "Base Price" of $60 per share mentioned in the agreement, or any other price that might be computed under the agreement. After the Chancellor had ruled in his *nisi* adjudication that the stock valuation provisions of the agreement would permit valuation upward from, but not lower than, the "Base Price" of $60, so that defendant's offer must be made at $60 per share, defendant filed exceptions to the court's order to sell at $60 and then offered to sell at that price. Plaintiffs refused. It was after this event, for the first time, that there was injected into the case the *defendant's* request for equitable relief. By special leave allowed by the lower court on September 24, 1970, defendant filed his "Additional Exceptions to Decree Nisi" (entered on June 10, 1970), which reads: "1. Defendant excepts to the Decree *Nisi* for its failure to require plaintiffs to purchase defendant's shares at the price of $60 per share." Thus, the Chancellor was charged with error for failing to do something on June 10, 1970 which was not in the case and not requested until September 24, 1970.

Aside from this bizarre and at least anomalous procedural phenomenon, I cannot agree with the majority's view on the merits of the case: that an averment in

the complaint that the plaintiffs stood "ready, willing and able to purchase all of defendant's shares in Aztec Metals, Inc.", bound plaintiffs, as in a case submitted for arbitration, not only to buy all of defendant's stock, but to do so at whatever price might eventually be fixed by the court. Thus, the majority would hold that plaintiffs had accepted an unpriced offer before it was made.

In my view, the pleaded offer to purchase was only a necessary averment in a specific performance case that plaintiffs would comply with the *agreement* if the defendant was ordered to do so. Defendant was properly ordered to offer his shares at $60 per share, but then, after that offer, the Court was at least limited by the terms of purchase in the agreement on which the suit was based. That instrument does not require that any of the plaintiffs buy any of the stock when offered. Indeed, it is not clear how this court's order would be enforced, for the agreement actually sets up a series of offers which the defendant must make which depend entirely upon the will of the plaintiffs to accept at the offered price. For example, while the defendant must offer all of his shares for sale, he may not offer them to any one shareholder. First, he must offer them "for a period of thirty (30) days . . . to each of the other Individual Shareholders . . . Second, any shares so offered which are not purchased as a result of the offer . . . shall be offered to the Company for a further period of thirty (30) days after the expiration of the . . . [prior offer] . . . Third, any shares so offered which are not purchased as a result of . . . [prior offers] . . . shall be offered to the Shareholder or Shareholders to whom no offer was required to be made . . . [by prior offers] . . . Such offer shall be for a further period of thirty (30) days after the expiration of the . . . [prior offers] . . .". The agreement then provides:

214

"(d)   All such offers shall be addressed to the other Shareholders and the Company and shall include the number of shares offered and the price and other terms at which such shares are offered as hereinafter provided.

"(e)   All such offers shall be *accepted in writing* and any such acceptance shall state the number of offered shares which the accepting Shareholders or the Company, as the case may be, wish to purchase." (Emphasis added)

Many more details regarding offers and acceptances are spelled out, and then Paragraph 6 provides: "6. FAILURE TO EXERCISE OPTION.   If any of the shares of Common Stock of the Company offered for purchase *pursuant to the terms hereof are not accepted* within the period or periods of time above prescribed, such unaccepted shares of Common Stock of such offering Shareholder shall thereafter be free from the provisions of this Agreement . . .".   (Emphasis added)

From the above, it is evident that the agreement being enforced in this litigation required an offer which was not made until after the litigation had been concluded below; and that this offer in writing was rejected in writing by those to whom it was made.   In my opinion, this rejection was the contract right of the plaintiffs, fully binding upon the defendant, which neither the lower court nor our court was free to disregard.   In short, I do not believe that the obligations of a contract can be impaired or disregarded by an averment in a pleading unless it amounts to a stipulation or a new agreement that revises or alters the old. Since I find nothing in this case to justify a judicial departure from the agreement's terms, I would leave the parties where the lower court did, still subject to the provisions of their agreement, and, therefore, would affirm the Chancellor's decree.