448 A.2d 48

CBS INC., d/b/a/ WCAU–TV

v.

CAPITAL CITIES COMMUNICATIONS, INC., d/b/a
WPVI–TV, Appellant.

PHILADELPHIA NEW YEAR SHOOTERS AND
MUMMERS ASSOCIATION, INC.

v.

CAPITAL CITIES COMMUNICATIONS, INC. d/b/a WPVI–TV
and Lawrence J. Pollock and Charles R. Bradley.

Appeal of CAPITAL CITIES COMMUNICATIONS, INC.
d/b/a WPVI–TV, Appellant.

Superior Court of Pennsylvania.

Argued Oct. 20, 1981.

Filed July 9, 1982.

558

560

Elihu A. Greenhouse, Philadelphia, for appellants.

Gregory M. Harvey, Philadelphia, for CBS, appellee at No. 91.

Janet M. Sonnenfeld, Philadelphia, for Philadelphia New Year at No. 92.

Before BECK, MONTEMURO and WATKINS, JJ.

BECK, Judge:

These appeals are from Declaratory Judgments entered in two actions consolidated for trial below. Appellees WCAU–TV and Philadelphia New Year Shooters and Mummers Association, Inc. (the latter appellee hereinafter referred to as Association) brought suit seeking to have a clause contained in an agreement, entered into between appellant WPVI–TV and appellee Association on October 5, 1977, declared void and unenforceable.[1] We hold that the challenged "option" portion of the agreement, if enforceable at any time, had expired prior to any attempt to exercise it, and affirm judgment for appellees. Appellant WPVI–TV filed a counterclaim in the WCAU suit claiming tortious

---

1. Appellee WCAU–TV sought a further declaration that appellee Association might lawfully contract with it in described terms. Appellee Association sought a further declaration that the agreement of October 5, 1977 was voidable in its entirety for fraud, and sought an accounting.

interference with a contractual relation. Appellee Association sought in its action a further declaration that the agreement of October 5, 1977 was voidable in its entirety for fraud, and sought an accounting. Appellant WPVI–TV filed no counterclaim in this action, but prayed in its answer for a declaration interpreting the contract in accordance with its claims.

## FACTUAL BACKGROUND

In Philadelphia, tradition hails the mummers who parade annually through the city on New Year's day. For as long as any living Philadelphian can remember, the Mummers' Parade of elaborately costumed string bands, portraying serious, comic, theatrical and historical themes, with prizes awarded to those judged best in each of the traditional "divisions," has been a major New Year's day event. The parade is televised and transmitted live. It has become an anticipated and lustrous part of the City's holiday celebration.

Appellee Association is an unincorporated association of string bands whose membership is comprised of some of the string bands (24 of them) which compete in the Mummers' Parade and two string bands which do not. Some time prior to 1974, pursuant to a series of written agreements, appellant WPVI–TV began to make payment to appellee Association in return for which it received the "exclusive right to telecast the performances" of the members of the Association during the Mummers' Parade.[2] For many years, the Mummers' Parade was telecast by and on WPVI–TV (Channel 6) and not by any other television station.

**2.** A Petition to intervene as parties plaintiff was filed below by the Philadelphia Mummers Brigade Association and certain string bands alleging that appellee Association represented only approximately half of the string bands participating in the Mummers' Parade. This petition was denied on the grounds that intervenors' position with regard to relief sought against appellant WPVI–TV was identical with that sought by the plaintiff in suit. Denial of the petition was without prejudice to the rights of the petitioners to seek other legal remedies as to their claims against the parties. The issue of the power of appellee Association to grant "exclusive" rights is therefore not before this court.

In September of 1977, the Vice-President and General Manager of WPVI–TV, Lawrence J. Pollock, the Program Director of WPVI–TV, Charles R. Bradley, the President of the Association, Frederick Calandra, and members of the "Television Committee" of the Association met at a restaurant. The prior written agreement between WPVI–TV and the Association, dated November 5, 1974 "expired January one, 1977" [3] and the meeting was held in order to discuss the terms of a new agreement.

At trial, Mr. Bradley testified that he stated to Mr. Calandra that the station would like to have a "first refusal option" in the agreement and explained to him "what a first refusal option was." [4] No other witness gave testimony with regard to the negotiation of the 1977 agreement. The written agreement was prepared by counsel for appellant WPVI–TV [5] and was executed under date October 5, 1977.

The agreement contained a preamble describing the subject matter, and then set forth the following terms:

1. Association hereby grants STATION the exclusive right to telecast the performances of its members in the said PARADE, and to record and telecast preview programs and other programs in which the performances by its members may be shown.

2. Subject to the provisions of paragraph 3 hereof, the STATION agrees to pay ASSOCIATION the following consideration for the said rights for the following years:

A. $13,000.00 for the PARADE scheduled for January 1, 1978;

B. $14,000.00 for the PARADE scheduled for January 1, 1979;

C. $15,000.00 for the PARADE scheduled for January 1, 1980;

3. Deposition of Lawrence J. Pollack, Notes of Testimony ("N.T.") at 81a.

4. N.T. at 416a.

5. Paragraph 16, Amended Answer to the Complaint, N.T. at 579a.

and STATION agrees to supply to ASSOCIATION $10,-000.00 worth of television advertising for the Mummers' Annual Show of Shows held at the City's Civic Center.

3. It is agreed that if a PARADE is not held in any year during the term of and any extensions of the term of this agreement, no consideration shall be paid for each year or years when such PARADE is not sponsored and officially recognized by the City of Philadelphia, or in any year in which the PARADE is not held.

4. Failure to telecast the PARADE in any year or years for reasons as set forth in Paragraph 3 hereof shall not effect the rights of the parties for other years during the term of this agreement or any extension hereof.

5. STATION is hereby granted the first option and privilege to renew this agreement beyond the termination date as set forth herein upon the same terms and conditions of any bona fide offer received by ASSOCIATION beyond the termination date as set forth herein.

ASSOCIATION agrees to give STATION notice of all details of any other bona fide offer received by ASSOCIATION, and STATION is hereby granted two months after receipt of such notice in which to exercise such first refusal option by written notice of election to do so. Upon exercise of such first refusal option, the terms and conditions of this agreement shall be extended in conformity therewith.

The agreement contained no terms other than the foregoing. Despite several references to "the term of this agreement" and "the termination date as set forth herein," no term of the agreement or designated termination date is anywhere set forth in the agreement.

By letter dated February 20, 1980 [6], appellee WCAU–TV offered terms for similar "exclusive" rights for a three year period, including an offer of escalating payments in the annual amounts of $30,000., $35,000., and $40,000. By letter dated April 29, 1980 [7], appellant WPVI–TV offered a five-

6. N.T. at 507a–509a.

7. N.T. at 510a–512a.

year agreement in terms including escalating payments in the annual amounts of $40,000., $45,000., $50,000., $55,000., and $60,000. The letter stated, inter alia, "In addition, Channel 6 will want to maintain the option and similar renewal agreement for a period beyond the proposed five years covered by this agreement, as exists in the current contract." By letter to appellee Association dated May 30, 1980 [8], appellee WCAU–TV, by its Vice-President and General Manager, Jay R. Feldman, stated that it had been advised "that a perpetual first refusal option for exclusive broadcast rights to Mummer events, such as might be claimed on the basis of your expired contract with WPVI–TV, would constitute an unreasonable restraint of trade and therefore would not be legally enforceable." The letter again offered a three year contract increasing the escalating annual payments to $70,000., $80,000., and $100,000. Joseph A. Purul, Chairman of the TV Committee of appellee Association, wrote to appellant WPVI–TV, by letter dated and hand-delivered June 3, 1980 [9], "to advise that WCAU–TV" had made an offer, and describing the terms of the offer. The letter concluded: "Inasmuch as the Mummers' Association body will make a determination on Thursday, June 19, 1980, which Channel will televise the Parade, it behooves you to submit your new proposal on or before that date if you so desire. If you do not intend to pursue the matter any further kindly advise."

On June 16, 1980, Mr. Pollock, in behalf of appellant WPVI–TV, met with the TV Committee of the Association and read aloud letter dated June 16, 1980 addressed to the Association, "attn: Joseph A. Purul, Jr., Esquire." [10] The letter thanked him for the June 3 letter "in which you gave us notice of the other offer, as provided in our 1977 agreement," and stated "WPVI–TV elects to exercise its first refusal option." The letter then stated, inter alia, "We offer

8. N.T. at 513a–515a.

9. N.T. at 516a–517a.

10. N.T. at 519a.

a three-year rights package of $75,000 the first year, $87,500 the second year, and $100,000 the third year" and offered to "match or exceed" all the terms of the WCAU–TV proposal.

Following the June 16 meeting, the Association received three additional offers:

June 18 [11]—WCAU–TV—increasing their payments to equal those set forth by appellant

June 19 [12]—KYW–TV—offering $100,000. each year for three years

June 19 [13]—WCAU–TV—increasing their payments to $100,000. per year for three years.

None of these offers was communicated to appellant WPVI–TV by appellee Association. Each of the two additional offers by appellee WCAU–TV contained language identical to the earlier offer stating its view that the "first refusal option . . . would not be legally enforceable."

On June 19, 1980, representatives of the 24 Association members who appear in the Mummers' Parade met and voted 23 to 1 to accept the June 19 offer by WCAU–TV. Accordingly, Mr. Calandra initialed WCAU's June 19 letter of intent and returned it to them. On June 23, 1980, WCAU–TV delivered to WPVI–TV its letter of the same date [14] notifying appellant of the intent of WCAU–TV to enter into a contract with appellee Association on the terms of the June 19 letter of intent, a copy of which was enclosed. Following conversations between respective counsel for the parties, on June 30, 1980 appellees brought the separate suits against appellant which resulted in the judgment from which this appeal is taken.

The court below held that:

A. Paragraph 5 of the agreement in suit [quoted above at page (5)] could only legally be construed to require

11. N.T. at 520a–522a.

12. N.T. at 523a.

13. N.T. at 524a–526a.

14. N.T. at 527a.

appellee Association to give appellant notice of bona fide offers which it has determined to accept.

B. Paragraph 5 could be so construed based upon testimony by appellant's expert witness that this was the understanding in the television industry of the term "bona fide offer." [15]

C. As so construed, the agreement was legally binding and enforceable, and it was unnecessary to consider, or rule with regard to, the expiration of the "first refusal option."

D. The purported exercise of the "first refusal option" by appellant as set forth in its letter of June 16, 1980 was ineffectual in that it did not relate to an offer which appellee Association was determined to accept.

E. Appellant was duly notified of the bona fide offer which appellee Association was determined to accept by the letter from appellee WCAU–TV dated June 23, 1980 and the filing of complaints June 30, 1980.

F. Appellant WPVI–TV failed to exercise its first refusal option during the two months following notice from WCAU–TV and the filing of complaints, and appellee Association is therefore free to contract with others.

Exceptions filed by appellant were denied, and judgment was entered for appellees and against appellant.

## ASSERTIONS ON APPEAL

Appellant asserts that it was error to hold that it had not validly exercised its "first refusal option" by the letter dated June 16, 1980. In the alternative, appellant asserts that it was error to hold that either notice from a stranger to the contract or notice by the filing of complaint constitutes compliance with the notice requirement of the contract.

15. Lawrence J. Pollock testified that he had described the impact of the right of first refusal to Association President Calandra on June 16, 1980 as resulting in a situation "where you are contractually bound to notify us of another offer you are going to accept...." 294a. There was no other testimony as to the understanding of the parties as to the meaning of "bona fide offer" of which notice was to be given.

## PRINCIPLES APPLICABLE TO REVIEW OF CONTRACT PROVISION

■ As well stated in *Bobali Corporation v. Tamapa Company*, 235 Pa.Super. 1, 340 A.2d 485 (1975) alloc. ref. construction of contract options and rights of first refusal must be in accordance with the principles of contract construction and:

In construing the terms of a contract we are guided by well-defined and fundamental canons of construction. Our Supreme Court has adopted the following principles:

'The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles.' (Citations omitted.) 'Contracts must receive a reasonable interpretation, according to the intention of the parties at the time of executing them, if that intention can be ascertained from their language. (citing cases.)' *Percy A. Brown & Co. v. Raub*, 357 Pa. 271, 287 [54 A.2d 35] (1947). *Id.*, 235 Pa.Super. 5–6, 340 A.2d at 488.

We must first look to the writing itself, for if the terms of the agreement are clear and precise, performance must be required in accordance with the intent as expressed in the agreement without resort to rules of construction or extrinsic evidence.

The question before us is whether the clause containing the right of first refusal is ambiguous so as to require interpretation. It is established that the intent of the parties to a written contract is the writing itself and when the words are clear and unambiguous the intent is to be found only in the express (sic) language of the agreement. *Felte v. White*, 451 Pa. 137, 302 A.2d 347 (1973) (other citations omitted). Thus, it is said that the agreement that is clear and unambiguous speaks for itself and is not subject to interpretation by reference to any circumstances other than those recited in the written agreement. (citations omitted). *Steuart v. McChesney & Joyce*, 284 Pa.Super. 29, 424 A.2d 1375, 1377 (1981).

▆ Where, however, the terms of the agreement are ambiguous and the intent of the parties cannot be ascertained by reference to the writing, the agreement will be construed strictly against the party who prepared the agreement, particularly in the event such party is in a superior bargaining position to the other contracting party.[16] In addition, extrinsic evidence may be introduced to show the common understanding and intent of the parties at the time the contract was entered into.[17]

▆ However, no extrinsic evidence may be introduced in an attempt actually to alter, amend, add to, or detract from the terms of the contract as written. Such evidence is barred by the Parol Evidence Rule.[18] Similarly, the court, may not construe a contract in such a manner as to write a new contract for the parties, but is confined to reasonable construction of the language as actually contained in the writing. It is well-established

> that 'The parties have the right to make their own contract, and it is not the function of this court to rewrite it, or to give it a construction in conflict with the accepted and plain meaning of the language used.' *Hagarty v. Wm. Akers, Jr., Co., Inc.*, 342 Pa. 236, 239 [20 A.2d 317] (1941); *R. F. Felte, Inc. v. White*, 451 Pa. 137 [302 A.2d 347] (1973).

*Bobali Corporation v. Tamapa Company, supra,* 235 Pa. Super. 6, 340 A.2d at 488.

**16.** *In re Breyer's Estate*, 475 Pa. 108, 379 A.2d 1305 (1977); *Egyptian Sands Real Estate, Inc. v. Polony*, 222 Pa.Super. 315, 294 A.2d 799 (1972). The rationale for this rule is directly applicable to the facts of this case:

> Since one who speaks or writes can by exactness of expression more easily prevent mistakes in meaning than one with whom he is dealing, doubts arising from ambiguity of language are resolved in favor of the latter. . . .

4 Williston on Contracts, Third Edition Section 621 at 760–761.

**17.** See *e.g., Grier Estate*, 403 Pa. 517, 170 A.2d 545 (1961) and *cf. Greenwood v. Kadoich*, 239 Pa.Super. 372, 357 A.2d 604 (1976).

**18.** *LeDonne v. Kessler*, 256 Pa.Super. 280, 389 A.2d 1123 (1978); *Book Metals Corp. v. Sitkin Smelting & Refining, Inc.*, 254 Pa.Super. 21, 385 A.2d 504 (1978).

## THE AGREEMENT IN SUIT

■ In the instant case, it cannot be said that the terms of Paragraph 5 of the agreement are so clear and unambiguous as to obviate the necessity for construction. Although the first segment of Paragraph 5 speaks of a "first option and privilege to renew," it is unquestioned and undisputed that it was never in the contemplation of any party to the agreement that Paragraph 5 conferred a privilege to renew the terms of that agreement. Similarly, the language of the second segment stating "the terms and conditions of this agreement shall be extended" cannot be taken to mean that either the Association or WPVI–TV was bound to extend the terms of the 1977 agreement. An ambiguity further arises as to what the notice duty of the Association is which is described as being to give WPVI–TV notice "of all details of any other bona fide offer." Reference to "any *other* . . . offer" could be read to mean that the provision only came into play once WPVI–TV had made an offer. Does "bona-fide offer" mean every genuine offer, every offer which is not a sham offer, which is received by Association, or only such offers as interest the Association? Would the notice by WPVI–TV of an intention to meet or exceed the terms of any such offer of which it had notice terminate all further negotiations, or would a new offer followed by new notice create new rights and obligations. Finally, and we believe most importantly, during what period of time was the Association under a duty to give such notice and during what period of time did WPVI–TV have the right to exercise a right of first refusal?

Applying settled principles of contract construction to the language of this agreement will yield a reasonable interpretation capable of performance with regard to each of the ambiguities except for the lack of termination date. Thus, construing the language strictly against appellant whose attorney prepared the agreement, it may reasonably be interpreted as setting forth a right of first refusal which prevents the Association from *accepting* any offer by a third party without first offering the opportunity to appellant

WPVI–TV to meet the terms of the third party's offer and giving WPVI–TV two months in which to decide whether to accept the offer to contract on those terms or waive its right of first refusal.

In *Gateway Trading Company, Inc. v. Children's Hospital of Pittsburgh*, 438 Pa. 329, 265 A.2d 115 (1970) in construing what purported to be an option to purchase land contained in a lease, but which option contained language similar to the agreement herein, the Pennsylvania Supreme Court held that the language created a right of first refusal, "described by Professor Corbin" as creating the following result:

> If a third party should make an offer, the owner was privileged not to accept it, and also not to make any offer to the promisee. But the owner was bound by duty not to accept the offer of the third party without first giving an option to the promisee.

The court therefore held that:

> The clear import of the instant rider provision was that the lessor was obliged to give Gateway written notice of the terms of any bona fide offer which it deemed acceptable and to allow Gateway to purchase the property on those terms before any sale to a third party was effected. . . .

While the cases on a right of first refusal are not many, a review of such cases together with standard provisions of contract law, establishes the following:

 A right of first refusal constitutes a promise to offer the res of the right to the promisee for such consideration as the promisor determines to accept on the basis of an offer from a third party before accepting the offer of the third party. A right of first refusal does not 'require the promisor to offer the res at all. The right of first refusal merely requires that before the promisor accepts an offer of a third party, he must offer the res to the promisee of the right for the consideration he is willing to accept from the third party. *Ross v. Shawmut Development Corp.*, 460 Pa. 328, 333 A.2d 751 (1975); *Warden v. Taylor*, 460 Pa. 577, 333 A.2d 922 (1975); *DeVries v. Westgren*, 446 Pa. 205, 287 A.2d

437 (1972); *Gateway Trading Co., Inc. v. Children's Hospital, supra, Sun Oil Co. v. Bellone,* 292 Pa.Super. 341, 437 A.2d 415 (1981); *Steuart v. McChesney, supra, Bobali Corporation v. Tamapa Company, supra.*

 Construing the instant right of first refusal in accordance with the principles thus adopted in this Commonwealth, the provisions of Paragraph 5 carry the clear import that the Association was obliged, during the life of the right of first refusal, to offer the televising rights to WPVI–TV on the terms of any bona fide offer from a third party which it had determined to accept.[19] WPVI–TV then had two months in which to accept that offer, thus exercising its right of first refusal, or to reject that offer, thus waiving its right of first refusal.

 On this basis, we agree with the lower court that the letter of June 3, 1980 from the Association to WPVI–TV, notifying it of negotiations with WCAU–TV and inviting it to make a "new proposal" can not be interpreted as inviting appellant to exercise its right of first refusal. The letter established that there was no pending offer which it was determined to accept, but on the contrary indicated that it wished all offers to be placed before it for full study and a determination on June 19. Similarly, appellant's letter of June 16 can only fairly be read as a bid and did not constitute an acceptance of any offer made by the Association. The fact that appellant also made an attempt to bind

19. The lower court relied upon expert testimony that the term "bona fide offer" is so interpreted in the television industry. We find that the lower court reached the right result under the law of Pennsylvania and all of the circumstances. However, the expert testimony was not relevant to the issue. As previously discussed, it is the intent of the *parties* which this court must ascertain. Had both parties been members of the same industry and equally cognizant of the usages in the industry, expert testimony as to custom in the industry would be relevant to ascertain intent. However, here appellee Association is wholly unfamiliar with the television industry. Mr. Calandra with whom the negotiation of the agreement primarily took place is a retired shipping clerk (456a) and may in no way be held to knowledge of television industry terms of art. Custom of the trade can only be relevant to show the understanding of the party who is a member of the trade.

appellee Association by using self-serving language does not alter the overall import of the letter as an attempt to outbid WCAU–TV and finalize negotiations. As stated in the opinion by Judge Stanley Greenberg in the lower court, "Their argument that the increased payment offered was an act of generosity not required under the circumstances and for which they should not be penalized, is not only a little far fetched, but is certainly not consistent with their previous dealings with the Mummers...." There was therefore no offer made by appellee Association to appellant WPVI–TV to exercise its right of first refusal, and no acceptance by WPVI–TV in the exchange of letters June 3 to June 16.

We cannot agree with the court below, however, that notice in accordance with the agreement was served upon appellant. The only offer which appellee Association determined to accept was the WCAU–TV offer of June 19 which it voted to accept. Appellant received no notice from appellee Association[20] that it had received that offer. Appellant received no notice from anyone that appellee was offering appellant the televising rights on those terms or any terms. On the contrary, appellant received notice, first by the June 23 letter from WCAU–TV and then by service of complaints, that appellee Association had accepted the WCAU–TV offer and that *both* appellees repudiated the right of first refusal as being unenforceable.[21] Under these circumstances, appellant could not be expected to respond as though it had received normal notice of an offer, requiring

20. The agreement states that "Association agrees to give station notice...." and it was appellee Association which was to give such notice. Appellant WPVI–TV could not consider either rumor via the news media nor communications from third parties as notice entitling it to exercise a right of first refusal. *C.f. Northwestern Mutual Life Insurance Co. v. Roth*, 118 Pa. 329, 12 A. 283 (1888): Notice from a stranger to the agreement is not adequate notice.

21. The filing of a complaint seeking to hold a transaction invalid does constitute notice of *rejection: Yates v. Clifford Motors, Inc.*, 283 Pa.Super. 293, 423 A.2d 1262, 1271 (1980). Such a complaint is clearly inconsistent with an *affirmance* of the agreement. Thus, the complaints filed herein cannot be interpreted as notice of an offer to contract in accordance with the right of first refusal.

acceptance or rejection. Therefore, if Paragraph 5 of the agreement of October 5, 1977 was valid and enforceable and had not earlier terminated, appellant has not received the notice required by the agreement.

However, this court is of the opinion that the issue of the validity of a perpetual right of first refusal is not immaterial as held by the court below, but rather is at the center of this controversy.

## TERMINATION DATE OF THE AGREEMENT

The issue of the termination date of the agreement was not argued or briefed by the parties as a result of the lower court's ruling on other issues. However, this court will consider the issue since it must consider all grounds for possible affirmance appearing from the opinion and record before it.[22] Appellees did argue in the court below, and in fact grounded their complaints on the claim, that the lack of a termination date for the right of first refusal rendered it invalid.

Appellant WPVI–TV claimed at trial, and offered testimony and exhibits tending to support, that it drafted Paragraph 5 in accordance with other agreements in the industry containing such rights of first refusal. However, each similar agreement presented by appellant as evidence contained a fixed term of the agreement and contained reasonably clear language establishing that the right of first refusal was to be exercised within the term of the agreement.[23] Moreover, each was negotiated with a corporate

22. See *E. J. McAleer & Co., Inc. v. Iceland Products, Inc.*, 475 Pa. 610, 381 A.2d 441, 443 note 4:
 We may, of course, affirm the decision of the trial court if the result is correct on any ground without regard to the grounds which the trial court itself relied upon. See *Mazer v. Williams Bros. Co.*, 461 Pa. 587, 594 n.6, 337 A.2d 559, 562 n.6 (1975); *Gilbert v. Korvette, Inc.*, 457 Pa. 602, 604 n.5, 327 A.2d 94, 96 n.5 (1974); *Prynn Estate*, 455 Pa. 192, 197 n.9, 315 A.2d 265, 267 n.9 (1973).

23. N.T. at 534a–545a.

distributor in the television industry, thus resulting in a common industry understanding of the language used. In the case of the agreement in suit, appellant WPVI–TV, who drafted the agreement, neglected to insert any designation whatsoever of the term of the agreement. With regard to the primary performance of the agreement, this creates no problem, for the central portion of the agreement relates to specific payments to be made for specific performances to be held on the three specific dates, January 1, 1978, January 1, 1979 and January 1, 1980. Some vagueness does arise with regard to the dates for "other programs" mentioned in Paragraph 1 of the agreement, resulting in a lack of clarity as to whether any portion of the agreement is expected to survive beyond January 1, 1980. We are here faced with language so vague, as it relates to dates in which performance of duties under the contract is required, that any attempt to construe the contract may be seen as actually rewriting the contract for the parties.

To the extent any construction is possible, the contract must be construed most strongly against the claims of appellant in light of the combination of the factors of appellant's greater sophistication in the television industry and the fact that appellant drafted the agreement and must therefore accept the burden of the uncertainty created by its omission of the "Term of the Agreement" paragraph normal to the industry.

While Paragraph 5 does use language relating to a right "to renew this agreement beyond the termination date," thus must be read to mean "to enter into a new agreement for the period beyond the termination date" when it is construed with the rest of the agreement and in light of its purpose. Similarly, the language indicating that such new agreement shall be based upon an offer "received by Association beyond the termination date" cannot possibly be read to mean that appellant has the right to meet all offers in the future, but clearly must be read to mean that the appellant

had the right to meet such an offer received by the Association during the term of the agreement, for performance beyond the termination date. In short, while the parties had the right and ability to draft and enter into an agreement which could have required the performance by some party of an obligation during some specifically limited period of time after the termination date of the agreement, they did not do so. At the very most, by reference to the period of time granted appellant WPVI–TV for response to notice, the agreement may be read to extend its right for the specific two-month period after the termination date.

There remains the question of whether we can ascertain a termination date and make a determination of the specific period of time during which performance was required of the parties.

Since the latest date mentioned in the agreement is January 1, 1980, we are forced to conclude that that date is intended as the termination date of the agreement. This construction is supported by the testimony of the Vice President and General Manager of appellant WPVI–TV that the prior agreement dated November 5, 1974 had expired on January 1, 1977.[24] Although representatives of appellant did refer to the prior contract as a "three year contract" both the above testimony and the conduct of the parties in entering into a new agreement prior to November 5, 1977 demonstrate that it was viewed as a tri-annual agreement, the three annual parades covered in the agreement setting the actual contract dates.

From all of the foregoing, we must conclude either that any obligation under the agreement imposed upon appellee Association to give notice of a bona fide offer which it was determined to accept expired at midnight on January 1, 1980, or the agreement is so vague as to termination date as to require that we hold that it was null and void for want

24. N.T. at 81a–82a.

of a term central to the agreement. In either event, we hold that no right of first refusal existed in appellant WPVI–TV on June 19, 1980 when appellee Association received the bona fide offer which it was determined to accept. Appellee Association was therefore free at all relevant times to contract with whomever it pleased.

## CONCLUSION

The Declaratory Judgment should have stated:

1. Paragraph 5 of the agreement entered into between Capital Cities Communications, Inc. (WPVI–TV) and Philadelphia New Year Shooters and Mummers Association, Inc. (Association) dated October 5, 1977 is construed to require that, during the term of the agreement, Association was required to give notice to WPVI–TV of any bona fide offer from a third party which Association had determined to accept, and before accepting any offer from a third party was required to offer to contract with WPVI–TV on the same terms as those offered by the third party. Upon receipt of such an offer from Association, WPVI–TV was given two months within which to accept such offer.

2. Paragraph 5 of the said agreement is either so vague with regard to the termination date that it is void for want of a term central to the agreement, or must be construed to have terminated no later than March 1980.

3. Appellant WPVI–TV had no existing right of first refusal at any time relevant to this litigation, such right having terminated no later than March 1980.

The Declaratory Judgment [25] appealed from is modified as above set forth and, as so modified, is affirmed. Judgment for both appellees in these consolidated appeals is affirmed.

**25.** The lower court entered one order setting forth its Declaratory Judgment in the two cases consolidated for trial. Judgment was entered thereon in each of the two cases, and the two appeals filed from the judgments and order of Declaratory Judgment are here consolidated.